**KAISER ALUMINUM & CHEMICAL CORPORATION**

v.

**The UNITED STATES.**

No. 49–63.

United States Court of Claims
Dec. 15, 1967.

318

Max Thelen, Jr., San Francisco, Cal., attorney of record, for plaintiff. Robert Gordon Sproul, Jr., and Thelen, Marrin,

Johnson & Bridges, San Francisco, Cal., of counsel.

Frances L. Nunn, Washington, D.C., with whom was Acting Asst. Atty. Gen. Carl Eardley, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner Roald A. Hogenson with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on November 21, 1966. Plaintiff filed exceptions to the commissioner's findings and the defendant filed exceptions to the commissioner's findings and recommended conclusion of law. The case has been submitted to the court on oral argument of counsel and the briefs of the parties.

The defendant now stresses one argument with which the commissioner did not treat, i. e., that plaintiff is guilty of laches in waiting until 1963 to file this suit and should therefore be barred from all recovery. (It is admitted that the suit is not foreclosed by limitations.) The main answer is that this court has not accepted the defense of laches as applying to contract actions against the Government; that defense has been confined to personnel suits for unlawful removal, suspension, or demotion from a federal position, and the court has given special reasons for its application to that area. See e. g., Henry v. United States, 153 F.Supp. 285, 139 Ct.Cl. 362, 366–370 (1957); Bovard v. United States, 160 Ct.Cl. 619, 620–622 (1963), cert. denied 374 U.S. 830, 83 S. Ct. 1872, 10 L.Ed.2d 1053; Alpert v. United States, 161 Ct.Cl. 810, 820–821 (1963). So far as the court is aware, no case in this court has applied the doctrine as a defense to a contract action. B-W Construction Co. v. United States, 100 Ct.Cl. 227, 236 (1943), on which de-

fendant relies, merely said that the long unexplained delay in bringing suit in that instance cast upon that plaintiff "a somewhat heavier burden in proving its case than usual." That was an evidentiary ruling, not an invocation of laches as such. We see no reason, now for the first time, to carry over laches as such to the contract field, and, as an evidentiary matter, we are not persuaded that the defendant's ability to make its case was materially harmed by the lapse of time before this action was begun.

Since the court agrees with the commissioner's findings, opinion, and recommended conclusion of law, it hereby adopts the same as supplemented by the preceding paragraph, as the basis for its judgment in this case. Plaintiff is, therefore, entitled to recover and judgment is entered for plaintiff in the sum of $7,198,655.55, with defendant's counterclaims and plaintiff's reply thereto dismissed.

## OPINION OF COMMISSIONER*

HOGENSON, Commissioner:

This is a suit for breach of four contracts, in which it is claimed by plaintiff, Kaiser Aluminum & Chemical Corporation (hereinafter Kaiser), that defendant unilaterally terminated its market guaranty commitments prior to plaintiff's completed contract performance. Two theories of recovery are presented. One is based upon contract terms, the other upon a so-called "most favored nation" right. In question are four contracts, essentially identical, each providing in substance for the private financing, construction and operation, by Kaiser, of aluminum reduction facilities (hereinafter the "additional facilities"), and for the production, at said facilities, of specified quantities of primary aluminum pig.[1] In exchange for these commitments, defendant undertook to guarantee the disposition, by purchase, of that portion of Kaiser's contract production in the additional facilities, which Kaiser would be unable to sell to others or utilize for its own fabricating purposes.

The parties have by formal stipulation withdrawn defendant's counterclaim and contingent counterclaim and plaintiff's claim for affirmative relief contained in its reply to such counterclams, agreeing that such withdrawal constitutes a full release of the matters set forth in such counterclaims and reply thereto, which pertain to transportation costs of aluminum purchased under the supply contracts, and defendant's counterclaims and plaintiff's reply thereto should be dismissed.

The contracts involved were executed in behalf of defendant by the General Services Administration (hereinafter GSA), acting under the authority of the Defense Production Act of 1950, 64 Stat. 798 (1950), 50 U.S.C. App. §§ 2061–2166 (1952), as implemented by Executive Order. In addition to Kaiser's contracts, defendant also entered into like agreements with the Reynolds Metals Company (hereinafter Reynolds) and the Aluminum Company of America (hereinafter Alcoa). These agreements, collectively designated as the aluminum expansion program, resulted from administrative implementation of the statutory purpose to meet the nation's heightened need for an expanded production of strategic materials during the Korean War emergency.

* The opinion, findings of fact and recommended conclusion of law are submitted under the order of reference and Rule 57(a).

1. The term "pig" denotes the initial product of an aluminum reduction plant as contrasted with "ingot" or "billet" which has been subjected to further processing and purification. The term "primary" denotes new or virgin metal, obtained directly from the electrolytic reduction of alumina, as contrasted to "secondary" which indicates a remelting of scrap. Hence "primary aluminum pig" is the basic product which is derived directly from alumina in turn derived from bauxite.

The contracts in question are the following:

(1) GS-OOP(D)—12006 dated as of December 19, 1950, calling for the production of 1 billion pounds of primary aluminum pig at reduction facilities to be constructed by Kaiser at Chalmette, Louisiana (hereinafter Chalmette I contract).

(2) GS-OOP(D)—12213 dated as of October 31, 1951, calling for the production of 200 million pounds of primary aluminum pig at reduction facilities to be constructed by Kaiser at Mead, Washington (hereinafter Mead contract).

(3) GS-OOP(D)—12143 dated as of November 6, 1951, and calling for the production of 1 billion pounds of primary aluminum pig at reduction facilities to be constructed by Kaiser at Chalmette, Louisiana (hereinafter Chalmette II contract).

(4) GS-OOP(D)—12192 dated as of February 28, 1952, and calling for the production of 82 million pounds of primary aluminum pig at additional reduction facilities to be constructed by Kaiser at Tacoma, Washington (hereinafter Tacoma contract).

Under its four supply contracts, Kaiser was obligated to produce 2 billion 282 million pounds of primary aluminum pig, and the ultimate question at issue here is whether this amount of production was achieved, as defendant claims, or whether, as Kaiser contends, completed performance demands the production of an additional 84,407,143 pounds. The controversy arises because the parties disagree as to the standard to be used in measuring production prior to April 1, 1957.[2]

Kaiser's basic premise is that Article I of the contracts clearly establishes both the quality and the quantity of the aluminum to be produced; hence, the computation of production prior to April 1, 1957, must be determined in accordance with Article I, which reads in pertinent part as follows:[3]

Subject to the terms and conditions hereof, Contractor agrees to produce and to sell Five Hundred Thousand (500,000) short tons of 2,000 pounds each, of primary aluminum pig, said primary aluminum to be of minimum grade of ninety-nine percent (99%) aluminum, which primary aluminum is herein called the "additional production." The Contractor will produce such aluminum from facilities which the contractor agrees hereafter to construct, herein called the "additional facilities." * * *

Kaiser interprets the foregoing to mean that contract production should be (a) limited to metal having a minimum purity of 99 percent or higher, excluding offgrade aluminum, and (b) that the weight of such minimum purity metal should be computed solely on the basis of net aluminum, consequently excluding the weight of any other metals added to make alloys, such added metals being hereinafter called alloys. (This basis of measurement shall be referred to as the "net basis.")

Pursuant to Kaiser's position, the weight of all metallic alloy additions (whether introduced in the melting pots during the production of primary pig, or subsequently in the holding furnaces during the production of ingots and billets) plus the weight of all "off-grade" (primary pig having a purity of less than 99 percent) would be excluded. As stipulated, the combined weight of such exclusions allocable to production prior to April 1, 1957, is 84,407,143 pounds. Hence, the application of Kaiser's method of computation would reduce the amount of contract metal actually produced prior to April 1, 1957, which in turn would re-

2. On September 13, 1957, the Kaiser contracts were amended, as hereinafter related. Paragraph 8 of the amendment provided a standard for the computation of production but this standard was given limited applicability in that its operation was prospective only, i. e., to govern only after the date of March 31, 1957.

3. Inasmuch as the contracts in question are identical in their relevant provisions, the references shall be to the Chalmette I contract.

sult in an extension of the contract performance beyond the date at which defendant claims full contract production had been achieved. The significance of the extension lies in the fact that Article III(c) of the contract comprehended a Government guaranty obligation coextensive with Kaiser's production obligation.

Article III(c) reads in part as follows:

Any quantity of additional production from the additional facilities not disposed of in accordance wth this Article III, and not otherwise sold or utilized by Contractor, may be tendered to the Government in the form of pig only * * *.

Given a situation in which aluminum is in long supply (which was the case in 1958 when defendant claimed the contracts had come to an end), the contractor could rely upon his Article III(c) right and "put" metal to the Government. In the case at bar Kaiser claims it had the right to "put" the additional 84,407,-143 pounds on the net basis of computation of contract production, applicable to the period prior to April 1, 1957.

Resisting what it regards as a unilateral attempt on the part of Kaiser to redefine the meaning of contract production, defendant argues, among other things, that the Kaiser contract amendment, executed on September 13, 1957, was negotiated on a basis which fixed the amount of contract production remaining after that date (thereby necessarily establishing the amount of production before hand). Further, defendant contends that Article I of the contracts, from which Kaiser derives its "net basis" argument and which it claims represented the standard for computing production *prior* to April 1, 1957, is an ambiguous term, one which received a different interpretation by each contractor. Moreover, defendant argues that it accepted the basis of measurement under which each contractor chose to operate (i. e., the interpretation which each gave to the meaning of Article I production) and therefore Kaiser should not now be permitted to abandon its previously elected standard.

Thus, it is defendant's position that the weight of *all* aluminum produced at the contract facilities prior to April 1, 1957, regardless of purity, including the weight of *all alloys* added in the reduction process (melting pots) and in the holding furnaces, should be included and attributed to the cumulative amount of contract production achieved prior to the effective date of the amendment. (This basis of measurement shall be referred to as the "gross basis.")

Inquiry must begin with the basic issue, that is, whether the definition of "additional production" as contained in Article I, provides a clear, unambiguous standard on the basis of which contract production prior to April 1, 1957, must be measured.

Considered only from the standpoint of its own terms, Article I would seem quite clearly to require exclusion of all alloys, since, by definition, it called for the production of primary aluminum pig specified only in terms of a minimum purity content, and no mention is made of alloys (other metals) to be added in the operation of the additional facilities. Yet the negotiations which followed after the execution of the supply contracts, and the complexities and practices of the industry, dispel any certainty which the casual reader might be led to assume from the language alone, and they provide ample proof that Article I's definition of "additional production" falls far short of possessing the clarity which Kaiser now seeks to attribute to it.

The history of the Kaiser supply contracts (and those of Alcoa and Reynolds) shows that the onset of performance brought with it questions of contract interpretation which remained the subject of negotiations for several years up to the time of the contract amendment executed between Kaiser and defendant on September 13, 1957, similar amendments being made to the Alcoa and Reynolds contracts at about the same time. Though the parties treated these issues in terms of separately identifiable ques-

tions (as indeed they were) the common element to many of the principal questions was the recognized necessity for the development of a uniform accounting system under which each contractor would report his production to defendant on the same basis.

Of the several questions involved, those bearing most directly upon the issue here concern the so-called "put accounting" and the "nonintegrated user" problems.[4] Both, as already noted, concerned the development of a suitable accounting system, yet each related to essentially different aspects of the supply contracts. The put accounting problem was concerned with the development of an accounting system by means of which it would be possible for defendant to verify the correctness of the amount of contract production which a supplier might seek to "put" to defendant. The nonintegrated user issue was directed

toward insuring (again by an accounting means) the contractor's full performance of its obligation to offer a stated percentage of its contract production to those aluminum fabricators whose plant facilities did not include the capability of manufacturing aluminum—either in pig or ingot form.[5] (Under the contract such fabricators were termed nonintegrated users.)

Examination of the documents which treat these two questions reflect a common denominator, that being, the need to achieve unanimity on a definition for the term "additional production." And then, as now, the question was whether production should be defined so as to include the weight of alloys introduced during the reduction process or in the holding furnaces, or whether production should be considered strictly in terms of the net aluminum content of each pig or ingot. Indeed, neither party

4. Another problem was that of metal substitution. Due to the fact that the aluminum supply program had been implemented in many cases through the expansion of existing facilities, physical intermingling of metal from non-contract and contract sources could not be avoided. Since the supply contracts permitted a contractor, in making deliveries under the contract, to substitute noncontract metal for contract metal, it was unanimously recognized that some means of control would have to be instituted in order to insure that the quantity of aluminum called for under the contracts was in fact being produced. All conceded that the maintenance of separate physical inventories was to be avoided and that an accounting approach to the problem of verifying contract production was indicated.

Yet another problem (called the Alcan issue) involved the aluminum producers' historic practice of purchasing aluminum from outside sources. This subject was never discussed during the negotiations leading up to the aluminum supply contracts, and when both Alcoa and Kaiser subsequently entered into long-term purchase agreements with the Aluminum Company of Canada, defendant became concerned over the possibility that it might, in an oversupplied market, be compelled to absorb a greater percentage of contract production via the put rights, than would have been the case absent the inflow of the additional Canadian metal.

Hence, defendant took the position that accommodation of metal purchases should be reflected in a downward adjustment of potential put rights.

5. In addition to defendant's desire to obtain metal for its own consumption as well as for stockpile purposes, defendant was also keenly interested in assuring that those aluminum fabricators who lacked the capacity to produce the basic metal nevertheless receive or have made available to them a percentage of the metal which was being produced. This obligation found expression in Article III(b) (1) which reads in pertinent part as follows:

(b) (1) For each consecutive six-month period referred to in subparagraph (a) above, Contractor shall offer in pig or ingot for sale to non-integrated users, at the price provided in ARTICLE XI hereof, the quantity, if any, by which the amount ordered by the Government for such six-month period, in accordance with subparagraph (a), is less than two-thirds of the reasonably estimated additional production for such period. (As used in this agreement, the term "non-integrated user" shall mean any manufacturer, fabricator, finisher or producer in the United States who is not a producer of primary aluminum or an affiliate or subsidiary of such a producer, and who is purchasing such aluminum for his own manufacturing, fabricating, finishing or producing operations.) * * *

disputes the fact that the matter of gross basis versus net basis was a subject of frequent discussion, but the important qualification which Kaiser now asserts is that these discussions were aimed at attaining a satisfactory definition for the purpose of *reporting* production and not for the purpose of developing a standard by which *to compute* production. To buttress this contention, Kaiser argues that the matter of computing production was never in issue and therefore the subject was never discussed until its introduction on September 13, 1957, this being the final day of negotiations and the day upon which the Kaiser contract amendment was executed.

This contention cannot be accepted. It is true enough that the negotiations were concerned with resolving the definition of "additional production" for reporting purposes, but it is unmistakably clear that the matter of how production under the contracts should be computed was also a subject with which Kaiser and defendant were frequently concerned, as well as the other industry members.

The scope of ambiguity inherent in Article I's use of the term "additional production" was recognized at an early date, and still existed as late as June 6, 1956, when Kaiser submitted a memorandum to the defendant setting forth the issues which had been under discussion between industry and Government representatives over the prior 2 years. One of the two major questions which the memorandum recognized as demanding resolution concerned:

(b) The proper accounting methods to be used for purposes of calculating the quantity produced under the contracts, the quantity which the contracts require be offered to non-integrated users, and the quantity, if any, which the contractor is entitled to "put" to the Government.

The attached appendix to this memorandum contained a more detailed analysis of the specific issues contained within the basic problems. With respect to the problem quoted above, the memorandum contained the following:

(3) It has been obvious to the parties for some time that it is in the mutual interest of all concerned to develop and agree on a uniform method of accounting for metal produced at the contract facilities. A uniform method is needed to determine how much of the contract tonnage has been produced from year to year, to determine what quantity the contractor is obligated to offer to nonintegrated users and whether this obligation has been performed, and to determine the quantity each contractor may "put" to the Government. If a uniform system is not adopted, each contractor can in good faith arrive at a method of accounting which differs from the methods used by the other contractors, and which may contain features unsatisfactory to the Government. This would lead to innumerable disputes when the Government audits the performance of the contractors, and would make it difficult for the contractors to make day to day operating decisions because of uncertainty as to the proper interpretation of the contract provisions.

(4) The following unsettled questions illustrate the importance of arriving at a uniform accounting method:

(a) The contract production must consist of pig and ingot containing not less than 99% aluminum. The pig and ingot produced at the contract facilities varies widely in aluminum content from 99% up or down, depending on the alloy requirements of the customer. Should computations of production, for purposes of calculating the quantity offered and sold to the Government and non-integrated users and the quantity to be "put" to the Government, include the alloy materials added in the reduction pot or after the metal is poured from the reduction pot, or should such computa-

tions be based solely on the aluminum content of each pig or ingot?

\* \* \* \* \* \*

The foregoing adequately outlines the present problems, and the failure to have totally met such problems has led to the present suit—the very dispute anticipated in 1956. But more importantly this document suggests a clear awareness on Kaiser's part that the significance of the problems inherent in defining production (which was a key factor in the numerous discussions that dealt with the question of establishing a uniform accounting system) extended well beyond the limited sphere of reaching an accord merely for the purpose of achieving uniformity in reporting sales and metal utilization.

This document thus stands as a clear admission by Kaiser that the contract production of primary aluminum pig, otherwise designated as the "additional production," not only lacked precision but also that a uniform method of computing contract production specifically required its resolution. Accordingly Kaiser's present contention respecting the clarity of Article I as a standard of computation must be rejected.[6] But the matter does not end there.

Events assumed their predicted course with each contractor reporting production pursuant to a different basis of computation. In this connection it should be pointed out that reporting of production was likewise a matter upon which the contracts were silent; hence, the procedure which any given contractor might choose was entirely within his discretion, yet ultimately subject to final Government approval.

Aware that each of the producers had temporarily accommodated the problem of measuring production on an individual basis, defendant offered the following proposal at the Government-Industry meeting which was held on June 27, 1956:[7]

That only the primary aluminum produced from the contract additional facilities and meeting minimum specifications (99% purity) be considered as production within the meaning of the contracts.

Both Kaiser and Alcoa indicated a willingness to accept this definition and to recompute their prior production ac-

---

6. Further proof of this conclusion is revealed in the various approaches that Kaiser submitted with respect to the problem of defining the term "additional production." The record discloses that Kaiser consistently recommended that production—for purposes of showing metal disposition (sales and utilization) be reported in terms of the total weight of *all* metal but that for purposes of computing actual production it did not adhere to any fixed concept.

Initially it recommended that production be computed in terms of potroom weights (net aluminum weight plus the weight of alloys added in the melting pot but excluding all alloys added thereafter). When it was suggested that both metal disposition and metal production be reported on a potroom weight basis, Kaiser changed its position. Thereafter it suggested (as before) that metal disposition be reported in terms of total weight, but that "for purposes of computing the total quantity of additional facility production covered by the supply contracts all alloy shall be excluded."

Kaiser strongly urges its recommendation to compute production on a net basis as proof of the fact that the matter was always so understood. This is only if one ignores all prior deliberations on the subject, but once placed in context, it becomes in reality what Kaiser then regarded it as, namely, a proposal only. Add to this Kaiser's earlier views on the subject of computing production and it becomes abundantly clear that the interrelationship between alloy treatment and the computation of production was indeed a recognized ambiguity.

7. The report of this meeting indicates the following different approaches taken by the three producers:

(a) Alcoa reported its production on a gross pot basis including alloys less scrap (both for production and sales reports).

(b) Kaiser reported gross pot production including alloys plus net holding furnace additions (metallic additions introduced in ingot production) for both its production and sales figures.

(c) Reynolds excluded alloys added in the melting pots for both production and sales figures.

cordingly. However, for reasons not disclosed in the record, no final agreement was concluded.

The state of uncertainty regarding the proper basis for computing production continued unresolved. Indeed, resolution was not required until market conditions reached the point that production at the additional facilities could not be disposed of by Kaiser by its own use or by sale to purchasers other than defendant. In December 1956, Kaiser made its first "put" to the Government and the need for resolution became intensified. In the months that followed Kaiser was forced to put to the Government additional amounts of its undisposable production excess, but it was mutually understood that the Government's acceptance of such tenders was conditioned upon the reaching of an agreement which would apply to the unresolved aspects of the contracts, including *inter alia* methods of computing and reporting production.

Though extensive negotiations between the Government and the individual suppliers (conducted separately with each supplier) commenced in June 1957, a final agreement was not reached with Kaiser until September 13, 1957, when an amendment to Kaiser's contracts was executed. Moreover, it was not until this final date that paragraph 8 of the amendment was proposed by the Government.

Paragraph 8 of such amendment, as adopted, reads as follows:

8. Computation of Production

After March 31, 1957, in computing and reporting production to the Government, production will be pot room weights including metallic additions.

As proposed by defendant, this language did not contain the phrase "After March 31, 1957," which was added at the insistence of Kaiser.

There is no dispute between the parties either as to the meaning of, or the applicability of, the provision for contract production after March 31, 1957. Both concur that as a standard for measuring such production, paragraph 8 requires that the weight of all metal (regardless of purity) plus the weight of all alloys added in the melting pots, count towards fulfillment of the contract tonnage. This standard does not, however, call for the inclusion of any alloys added in the holding furnaces. It is clear that this paragraph was meant to have prospective application only, i. e., effective after March 31, 1957, and therefore it may not be viewed as providing a retroactive resolution to a long-standing dispute. Hence the ultimate question remains—how should production prior to this date be computed?

The defendant argues that since Article I was ambiguous, it was open to Kaiser to adopt a means of computation consistent with its own interpretation and that the basis thus chosen subsequently received implicit acceptance by the Government. This acceptance is alleged to derive from the fact that during the final series of negotiations (conducted from June through September 1957), Kaiser, in the context of discussions seeking a compromise and settlement of the so-called Alcan issue (see n. 4, supra), represented its remaining contract production on the same basis that it had consistently employed in reporting production (i. e., a gross basis which included the weight of all metal regardless of purity plus the weight of all alloys added in the reduction pots and in the holding furnaces, see n. 7(b), supra) and that this basis, though not expressly so stated, was impliedly incorporated into the amendment of September 13, 1957, as finally executed. Additionally, the defendant points out that the previous basis of computing production likewise appears in paragraph 5 (quoted infra) of the amendment in the sense that it was employed in the calculation of the 78 million pounds specified in said paragraph. The argument, in short, is that Kaiser may not now reject the amendment's underlying and fundamental implied premise, hence it may not demand the retroactive application of a net basis standard.

There are two aspects to be considered regarding the defendant's position on the contract amendment. Both present a common element, that is, they both concern the negotiations whose principal object was to limit the defendant's "put exposure." But paragraph 5 of the amendment deals with metal the defendant *has accepted*, whereas the Alcan issue (which was resolved by decreasing Kaiser's put right in an amount equal to its metal purchases) deals with metal the defendant *may be* asked to accept. This difference compels separate analysis.

Paragraph 5 of the contract amendment states:

> With respect to the production year ending March 31, 1957 you have tendered to the Government, and the Government has accepted, 78,000,000 pounds of primary aluminum. The acceptance of that amount of primary aluminum is hereby ratified and constitutes a complete fulfillment of the Government's obligation to accept tenders of primary aluminum pig for such year.

■ From this, the defendant derives the argument that the 78 million pounds were impliedly computed in accordance with the gross basis, that such basis cannot now be changed, and Kaiser cannot recompute the prior production to which the amount specified relates.

This contention cannot be accepted. No substantial proof has been introduced to support the assertion that a gross basis standard was relied upon in fixing the 78 million pounds specified in paragraph 5. Furthermore, it is difficult to see any logical connection between the present issue and the amount of metal defendant accepted for the production year ending March 31, 1957. Had this tender (the 78 million) contained alloys, then one could see merit in defendant's present argument, since, in such a situation, specifying a total weight, by incorporating alloy weights, would seem to produce the finality for which defendant now argues. But such is not the situation here. The weight of the 78 million pounds of unalloyed pig represents nothing more than undisposable production excess. Whether Kaiser adhered to a net or a gross basis in computing its production would not reduce the weight of its production excess by one iota, and unless that excess incorporated a standard (i. e. included alloys which Kaiser either included or excluded in ascertaining total weight) it bears no relation to the question at issue in this case. Defendant does not assert (nor is it evident) that it accepted alloyed pig, and it cannot be concluded that what defendant accepted was computed on a gross basis.

Regarding defendant's Alcan argument, it is defendant's contention that during the June-September 1957 negotiations, Kaiser represented its remaining producton at 503.4 million pounds, that this was computed on a gross basis, and that this would in fact have been the approximate amount of production remaining if prior *reported* production were taken as the equivalent of actual *contract* production. Here, as in the case of paragraph 5, the defendant falls back upon an "incorporation" argument, contending specifically that the Alcan solution was predicated upon the assumption that the gross basis standard, as reflected in Kaiser's reported production, and from which it allegedly derived its remaining production figure, must likewise be the standard governing the amount of prior production. If a recomputation were permitted, the argument continues, then the remaining production figure would likewise be affected.

However, the record does not support the claim that Kaiser represented its remaining production at 503.4 million pounds but rather an amount of approximately 544.1 million pounds. The record strongly suggests that the defendant obtained its figure simply by deducting the amount of prior reported production from the total contract tonnage, and that only in that sense (through its records) did Kaiser, in fact, make a "representation."

Aside from the inaccuracy as to the basic fact, the more fundamental objec-

tion to the defendant's argument is its assumption that Kaiser's reported production was the equivalent of contract production computed on the basis of a gross standard. Such was never the case and therein lies the heart of the matter. By equating the two, as the defendant now does, it reveals its basic misconception in regard to the scope of the gross basis standard. The record offers abundant proof of the fact that Kaiser always regarded the matter of reporting production as a subject distinct from the matter of computing production (for contract purposes). Virtually every proposal submitted by Kaiser, reflects this dual approach, and under it, *regardless of the standards advocated,* reported production always exceeded "contract" production. The difference is attributable to the fact that for reporting purposes, Kaiser included the sum total of *all* production. In other words, the reporting technique was on the basis of total weight of finished products including the weight of all offgrade aluminum shipped as such. However, for computing purposes Kaiser was concerned strictly with the weight of the contract product, i. e., primary aluminum pig or ingot. And in regard to the latter, the constant question was whether contract production should be computed according to the net weight of the aluminum or whether it should also include alloy weights as well. At no point during the years in which the questions of defining the term "additional production" was under discussion, did Kaiser ever advance the proposition that computed production (as distinguished from reported production) should also include offgrade metal. In effect, the terms "gross" or "net" meant one thing when applied to reported production, and another when applied to computed production. Indeed it was the defendant's desire to achieve uniformity between the two, but it may not use that aim now to enlarge the ambit of ambiguity involved in the question of how production should be *computed.* As to this, the question always was: Should the alloys in the reduction pots or in the hold-ing furnaces count towards the total contract tonnage? There is no room in that question, or for that matter, in the contract language itself, to sustain the defendant's present position, to wit: that offgrade metal (which by definiiton refers to metal having a purity less than that called for under the contracts) should be included in the amount of contract metal produced through March 31, 1957.

It is clear that Kaiser never knowingly agreed to this, and it is similarly clear that if Kaiser's basis of computing production had been incorporated into the amendment as the defendant now argues (whether that basis included alloys or not) it would *not* result in the inclusion of the 61,117,911 pounds of unreblended offgrade attributable to Kaiser's performance through March 31, 1957.

 From this, three conclusions follow: First, the defendant's argument that the Article I ambiguity was resolved through the incorporation in the contract amendment of Kaiser's method of computing production, *as reflected in its reported production,* must be rejected. The method of reporting production simply bears no relation to the method of computing contract production, regardless of the standard involved. The equation of the two was the result of the defendant's own assumptions about the matter, and not any obscurity which Kaiser deliberately fostered. Secondly, it seems clear that the question of how production should be computed prior to April 1, 1957 (within the limits of the ambiguity which this opinion recognizes) was not resolved in the September 13, 1957, amendment because the parties deliberately made the standard prospective as to production after March 31, 1957, and no implied standard can be found for prior production. And finally, the ambiguity notwithstanding, there appears to be no basis for resisting Kaiser's clear right to exclude from "contract" production the weight of the offgrade metal that was included in its production reports, since this was never embraced within the scope of the Article I ambigu-

ity. The contracts called for the production of primary aluminum pig and ingot having a minimum purity of 99 percent. The single question which this raised, and which remains unanswered, concerns the treatment of the alloys contained therein. Neither the contract, nor its amendment, provided any answer to this question.

The thought is inescapable that both Kaiser and the defendant entered into the final round of negotiations on the supposition that *all* matters would be settled, the defendant operating on the premise that reported production should be the equivalent of actual contract production, and Kaiser operating on the premise not only that its distinctions between reporting and computing production had been understood, but further, that the net basis of computation would govern the computation issue at least up to the cutoff date of March 31, 1957.[8] The legitimacy of this speculation is heightened when one considers the fact that paragraph 8 of the amendment which provides for a basis of computing production after March 31, 1957, did not, as originally proposed by defendant, contain the limiting words, "after March 31, 1957." That Kaiser insisted upon, and that defendant acquiesced to, a limitation of this clause to the period *after* March 31, 1957, strongly reinforces the notion that each wanted to insure *the prospective* application of a new standard, thus preserving, what each supposed would be the controlling standard governing production *prior* to March 31, 1957. But neither of these opposing assumptions can now be molded into a judicial construction of contract language. They succeed only in proving the negative, and the ambiguity remains.

■■ While there is a legion of judicial precedents, involving application of rules for resolution of ambiguities in contract language, in which the courts

have strained to determine actual or presumed intent of the parties, or at least to determine what the parties were to be held to have intended under the facts and circumstances attendant to the execution of the contract, or from their conduct thereafter, it would seem that in this case (in the face of lack of definition in the contracts and consistent and reasonable disagreement of the parties) the requisite mutual intent—actual or presumed—cannot be found as a basis to determine what the agreement of the parties should be held to be regarding how contract production should be computed for the period prior to April 1, 1957, at least as it pertains to alloys added in the melting pots and holding furnaces. It is my opinion that the court should not undertake to write provisions into the contracts when the record fails to show what the parties actually intended, or even to furnish a basis for determining (by application of some rule of interpretation, implication or construction) what the parties must have intended or will be held to have intended as reasonable persons acting in good faith and with fair dealing. Robbins v. Rollins, Ex'rs, 127 U.S. 622, 633, 8 S.Ct. 1339, 32 L.Ed. 292 (1888); 3 Corbin On Contracts, Interpretation, § 541 (1960); 17 Am.Jur. (2d), Contracts, § 242 (1964). The contract terms and conditions were the joint work product of the negotiators for industry and the Government, and neither party can be said to be the drafter of the original contract language. See WPC Enterprises, Inc. v. United States, 323 F.2d 874, 163 Ct.Cl. 1 (1963). No acceptable basis for resolution of the contract ambiguity has been advanced by either party.

However, Kaiser has presented an alternative theory of recovery, one founded upon its alleged right to so-called "most favored nation" treatment. This, it is claimed by Kaiser, clearly entitles

---

8. The legitimacy of this assumption derives from the fact that the defendant itself had proposed a net standard—at least for reporting purposes. Kaiser not only agreed to this, but further suggest-

ed that production also be computed on this basis. Kaiser proposed this dual net basis approach as a basis for final settlement as late as February 1957.

it to recover in this case, even though it be assumed that the contracts are ambiguous.

At the time of initial negotiation of the aluminum supply contracts, it was indicated to the contractors that the defendant would follow a policy of uniformity of treatment in its dealings with various suppliers. This policy, expressed initially as a verbal commitment, became part of the defendant's contractual undertaking, and was subsequently confirmed by way of letter agreements. In fact, prior to the execution of the contracts, this oral commitment became a firm agreement between Kaiser and defendant due to the fact that Kaiser's lending institutions insisted that equal treatment be accorded to Kaiser under the industry contracts in order to maintain Kaiser in a competitive position.

Under the agreement, Kaiser had the right to compel the amendment of its own contracts to correspond with the terms of the contracts of its competitors (i. e. Alcoa and Reynolds). One letter confirming the agreement stated that "such amendments will be for the purpose of bringing your contract into conformity with agreements with such other companies." By way of limitation, the letter provided that "this commitment is limited to contracts relating to the proposed expansion of aluminum reduction capacity now being negotiated with your Company, Aluminum Company of America, and other companies * * * and to not beyond thirty days following the submission to you of the last such contract." Kaiser does not contend that more favorable contract articles were accorded to its competitors. In fact, the supply contracts with Kaiser, Alcoa, and Reynolds were in substance alike, and Kaiser never requested inclusion of Alcoa or Reynolds terms within the 30 days allowed, nor at any time, except for a minor matter not here relevant.

Relying upon this commitment, Kaiser contends that its supply contracts, being essentially the same as the Reynolds supply contracts, must therefore receive as favorable an interpretation, and inas-much as Reynolds' production prior to April 1, 1957, was computed on a net basis, Kaiser argues a right to similar treatment. Defendant's failure to permit Kaiser to change the basis upon which it had historically reported its production and to compute its contract production on a net basis, is therefore regarded as a breach of contract.

In computing its contract production for put accounting purposes for production prior to April 1, 1957, Reynolds eliminated all offgrade aluminum and all alloy metals added in the operation of its contract facilities, and defendant discharged its contract obligations to Reynolds accordingly. In view of this disparity of treatment between Kaiser and Reynolds, consideration must be given to the question as to whether there was a breach of defendant's promise to afford to Kaiser contract terms equal to those accorded to the other industry members. The basic validity of such an undertaking has previously been recognized by this court. Kaiser Aluminum & Chemical Corp. v. United States, 287 F.2d 890, 152 Ct.Cl. 641 (1961), in which defendant undertook by letter agreement to give to Kaiser "corresponding treatment" received by Reynolds on sales by defendant of aluminum reduction plants, and not to offer the same type of plants to Reynolds "on a more favorable basis."

However, to arrive at Kaiser's conclusion that it is entitled to recover under the most favored nation right, one must first accept the view that the agreement granted a right to compel uniformity in interpretation, and if this be so, there remains the question as to whether the waiver which Kaiser executed in conjunction with the September 13, 1957, amendment effected a waiver of the very right now claimed.

Although the letter agreement does not expressly state that uniformity of interpretation would be accorded to like contract terms, one must accept this as its only reasonable meaning. Adherence to the defendant's argument that this agreement gave Kaiser nothing more than the right to have incorpo-

rated in its contracts what appeared to be a more favorable contract provision accorded to Alcoa or Reynolds, without the subsequent right to obtain equality in the interpretation of said provision, would reduce the agreement to a mere illusion. Under such circumstances reliance upon the right would be an empty exercise. Defendant did provide the three industry members with equivalent contract terms, but it is implicit in the most favored nation agreement that equality of treatment would not be destroyed by according different interpretations of the same contract provision to the three competitors. (Cf. Crown Coat Front Co. v. United States, 292 F. 2d 290, 292, 154 Ct.Cl. 613, 616 (1961), in which the court sustained by implication the Government's right under a supply contract to test an article for required chemical content, even though no such test was provided under the testing clauses of the contract, because otherwise the chemical requirement would be meaningless.) Defendant's further argument must be rejected that the agreement was restricted to a 30-day period. This limitation narrowed the time-frame during which Kaiser could request the adoption of a provision contained in either Alcoa or Reynolds contracts but it cannot reasonably be held to effect a corresponding restriction with respect to the defendant's fundamental obligation to insure uniformity in the administration of like provisions. The conclusion in this regard is reinforced by the fact that defendant requested a waiver of Kaiser's "most favored nation" right during the course of the 1957 negotiations—6 years after the right had initially been granted. Surely this is a clear acknowledgement that the agreement provided Kaiser with a right whose efficacy was not limited to a period of 30 days.

These considerations notwithstanding, defendant contends that whatever right Kaiser might have had in regard to equality of treatment, Kaiser waived that right. During the June–September 1957 conferences between Kaiser and defendant, while the separate conferences with Alcoa and Reynolds were being held, defendant requested Kaiser to provide a waiver of the most favored nation commitment. Under date of September 20, 1957, Kaiser supplied defendant with a letter, referring to the September 13, 1957, amendment to the four Kaiser contracts, and to the defendant's letters which had confirmed the most favored nation agreement, and stating further:

> Kaiser Aluminum & Chemical Corporation hereby waives its rights to "most favored nation" treatment under the letters of November 27, 1950, and September 29, 1951, with respect to any agreements amending the above-captioned contracts which you have entered into or are about to enter into with Aluminum Company of America or Reynolds Metals Company, to the extent that such amendments cover the same subjects covered in the agreement amending the above-captioned contracts with Kaiser Aluminum & Chemical Corporation entered into between us on September 13, 1957.

The amendment to the Reynolds contracts (September 16, 1957) covered essentially the same subject matters and compromises achieved in the Kaiser amendment, and it must be concluded from the preferential treatment received by Reynolds, that neither Reynolds nor defendant intended to define contract production prior to April 1, 1957, other than on the net basis. The record fails to show that any modification was made in the Alcoa amendment concerning computation of contract production prior to April 1, 1957. Since there is no substantial evidence indicating a contrary meaning, the plain language of Kaiser's waiver letter must be accorded its apparent meaning, i. e., that the only waiver of its "most favored nation" right was as to the September 1957 amendments of the Alcoa and Reynolds contracts "to the extent that such amendments cover the same subjects" covered in the Kaiser amendment. Thus, it must be concluded that by its September 20, 1957, letter, Kaiser did not waive its "most favored

nation" right to compute contract production prior to April 1, 1957, in the same way Reynolds was permitted to do, because the only definition of contract production contained in the September 1957 amendments of the contracts of the various industry members pertained only to production after March 31, 1957.

Plaintiff's petition seeks recovery of $7,563,000 for the alleged breach of contracts. By stipulation of the parties filed herein and included in the trial commissioner's memorandum of pretrial conference, the parties agreed (subject to the limitations stated in paragraphs 7 and 8 of the stipulation) that on the basis that plaintiff is entitled to recover on the offgrade and/or alloy issues, then the court shall enter judgment for plaintiff in the amounts set forth in paragraph 4(a) and/or paragraph 4(b) of such stipulation, which provide as follows:

4. (a) The offgrade issue involves 61,117,911 pounds of aluminum, and damages shall be assessed at the rate of $.0823519 per pound or a total of $5,033,178.

(b) The alloy issue involves alloys added to the reduction cells or pots in the amount of 6,445,079 pounds, and alloys added in the furnaces in the amount of 16,844,153 pounds, and damages shall be assessed at the rate of $.0823519 per pound or a total of $1,917,912.50.

The above-mentioned limitations to such stipulations are contained in paragraphs 7 and 8 of the stipulation, as follows:

7. It is defendant's contention that if the court should find that plaintiff, as a matter of law, is entitled to recover damages, the damages claimed are excessive and that damages should be limited on the theory and in the amount set forth in paragraph III(b), page 17, of Defendant's Response to Plaintiff's Submission Pursuant to the Order of the Commissioner Dated September 4, 1963. If the court finds, as a matter of law, that this alternative theory of damages has been establish-

ed, then the court shall enter judgment for the amount of $1,450,618 [amended during the trial to $1,423,165.58] on the alloy and offgrade claims, or a proportionately smaller amount if the court should find in favor of plaintiff on only a part of its total alloy or offgrade claim.

8. In paragraph III(c) of Defendant's Response to Plaintiff's Submission Pursuant to the Order of Commissioner Dated September 4, 1963, relating to "pre-completion" aluminum production, pages 17–18, defendant raises a defense on damages. The number of pounds of pre-completion aluminum production is set forth in Schedule L, appearing at page 18 of Defendant's Response Pursuant to Rule 43(d)(2) to plaintiff's Statement of Items and Figures Intended to be Proved. Plaintiff agrees that the figures are correct, but denies that defendant is entitled to offset all or any part of said pre-completion production against the offgrade or alloy claim. If the court finds, as a matter of law, that this defense is valid, then its effect is to reduce or offset plaintiff's alloy and offgrade claims in whole or in part so that plaintiff will be entitled (a) to no recovery, and judgment may be so entered; or (b) to a judgment in an amount less than its full alloy and offgrade claim, if the court should find, as a matter of law, that only part of this pre-completion tonnage should be offset.

The referenced paragraphs of defendant's pretrial submission state as follows:

III. Damages. * * *

b. Even if the above were not true, plaintiff could not claim that it had been damaged to the full amount of the 86,035,297 pounds. By the contracts defendant guaranteed a market, it did not guarantee to absorb *all* production—only that not otherwise disposed of. Plaintiff's records show that only 20.474% of this production would have been delivered to the Government. Thus plaintiff's claim for

lost profit ($7,085,173) should be reduced by 79.526% ($5,634,555) leaving the maximum amount of the claim at $1,450,618. But before even this is considered plaintiff should be put to its proof as to its inability to dispose of the entire production without invoking its right to tender to the Government.

c. The contracts for Chalmette I and II provided that "production [for purposes of contract computation] shall commence upon the date of completion of the additional facilities." The date of completion was then defined as "the first day upon which 90 percent of the electrolytic cells, which are to be constructed as part of the additional facilities, are tapped." By staggering the completion of its lines at Chalmette I and II plaintiff enjoyed "free production" not charged against the Government's guarantee or required to be offered to nonintegrated users, in the amount of 112,906,000 pounds. The claimed weight of 86,035,297 should be set off against this excessive "free" pre-completion production. At the appropriate time defendant will move to amend its answer to assert this defense.

From the foregoing stipulation regarding damages, it follows that on the basis of entitlement to recovery on both the offgrade and alloy issues (alloys added in both the reduction pots and holding furnaces), plaintiff is entitled to recover the sum of $6,951,088.59, unless such sum should be reduced or eliminated in accordance with defendant's contentions (a) that plaintiff must prove that it had the capacity to produce all or part of the 84,407,143 pounds claimed as remaining contract production, and could not have sold such additional production to others, (b) that such damages should be reduced by 79.526 percent, and (c) that the pre-completion production of 112,906,000 pounds of aluminum at the additional facilities should be deducted from, thereby eliminating, the 84,407,143 pounds now claimed by plaintiff. These contentions are considered seriatim.

In 1958, plaintiff was the third largest producer of primary aluminum pig in the United States, with an installed capacity to produce a total of 89,500,000 pounds of primary aluminum pig per month. Its collective physical plant consisted of eight potlines at Mead, Washington, three potlines at Tacoma, Washington, nine potlines at Chalmette, Louisiana, and two potlines at Ravenswood, West Virginia, representing a total of 22 potlines. In terms of cost of operation, these plants ranked from the most costly to the least costly in the following order: Tacoma, Mead, Ravenswood, and Chalmette. From the standpoint of efficiency, they ranked from the least efficient to the most efficient in the following order: Tacoma, Mead, Chalmette, and Ravenswood.

When, on March 14, 1958, Kaiser was advised that defendant would accept only a part of the March 1958 tender, and that such acceptance marked the end of contract production, Kaiser premised its ensuing action on what it then foresaw as its legal duty to mitigate damages flowing from breach of contracts. It moved to reduce its production to accord with the decrease in demand, and the plant shutdowns that followed took into account the relative efficiency and operating costs of its various facilities. Kaiser's position as outlined in its March 24, 1958, reply to defendant, reads in pertinent part:

> * * * Since the loss of profit resulting from the shut down of non-contract facilities is smaller than the loss of profit resulting from the shut down of Contract No. GS–OOP–(D)–12006 facilities [Chalmette I supply contract], the result of shutting down the non-contract facilities is to further mitigate the damages flowing from your action.

During the period from February 28, 1958 to June 1, 1958, Kaiser shut down a total of six potlines of which three were located at Tacoma, two at Mead, and one at Chalmette. In addition, two potlines at the Mead facility, originally shut down as a result of a power shortage,

were maintained in standby condition, although power had been restored by January 27, 1958. Five of the potlines remained idle through October 18, 1958, with three being started somewhat before that date. The idleness of these potlines in the period from January 27, 1958, through October 18, 1958, was due to economic conditions, i. e., excess of supply over demand for aluminum. The total idle capacity of these eight potlines, when projected through the date of October 18, 1958, amounted to 140,703,000 pounds. October 18, 1958, is the date when contract production would have been completed under plaintiff's theory of computation.

Under the supply contract it .was defendant's obligation to guarantee the disposition of the contract production. Since the contracts expressly provided for the substitution of aluminum from non-contract facilities for aluminum actually produced at the contract facilities, Kaiser's decision to shut down non-contract facilities creates no legal issue.

 During the period from March 1958 through October 1958, production at the idled facilities, if not curtailed, would have produced a surplus of at least 91 million pounds. This latter conclusion is based upon the following: In March 1958, Kaiser's inventory of primary metal was high at approximately 60 million pounds, sales had fallen to approximately 66 million, while total primary capacity (including Alcan contract purchases) stood at 96 million pounds. The imbalance of these factors—increasing inventory, decreasing demand, and high production potential—resulted in the decision to shut down some of the reduction facilities. Thus, from March 1958 through October 1958, cutback in production was undertaken, while, at the same time, sales and other dispositions and lessening production resulted in a general decline in Kaiser's inventory level, which, for the period in question, fell from 60 million pounds in March to a low of approximately 11 million pounds in October 1958. Relating this factor (the 49 million inventory decline) to the idle plant capacity of 140,703,000 pounds, it becomes obvious, that had production not been curtailed, surplus production of 91 million pounds would have resulted. It is concluded that Kaiser had the plant capacity to produce the 84,407,143 pounds of remaining contract production, and that it could not have sold such excess production to others, and therefore would have put such amount to defendant as contract production.

The fact that during the period from March 18, 1958, to November 4, 1958, defendant purchased 125 million-pounds of primary aluminum pig from plaintiff under the contracts does not defeat Kaiser's claim, even though such purchases contributed to the disposition of all of Kaiser's production during that period, even to the extent that Kaiser in October 1958 had only an inventory of 11 million pounds. Such purchases were merely transactions which in part established the facts stated concerning Kaiser's declining inventory, and support the finding that economic conditions required the shutdown of the eight potlines, since such "put" acquisitions were made after the Government stockpiling of aluminum had become excessive. Of course, such purchases undeniably contributed to the disposition of Kaiser's production during that period, but it cannot be concluded that they in any way affect the conclusion that Kaiser could have produced the additional 84,407,143 pounds which Kaiser could have put to defendant. It was defendant's refusal to purchase this additional quantity which necessitated curtailment of production under the existing economic conditions, and defendant's breach of Kaiser's most favored nation right cannot reasonably be exonerated merely because Kaiser took reasonable steps to mitigate its damages and reduced production to the extent that there was no excess of production over dispositions of aluminum.

Equally strained is defendant's argument that the stipulated damages should be reduced by 79.526 percent merely because during the years 1954–1957, Kaiser sold only 20.474 percent of its total sales

and other dispositions of its gross production to defendant. Defendant's obligation was to purchase not just a fixed percentage of either gross sales and dispositions or of contract production, but all contract production which Kaiser could not use itself or sell to others. Had economic conditions been such that defendant was required to make no purchases during the 1954–1957 period, defendant could not be sustained in an argument that it was therefore relieved of any obligation to purchase in 1958 even though economic conditions resulted in the circumstance that substantial amounts of contract production in 1958 could not be disposed of except by Government purchases.

With respect to the stipulated damages, defendant further argues that the 112,-906,000 pounds of pre-completion production at the additional facilities should be applied to off set completely the 84,407,-143 pounds which Kaiser could have produced and put to defendant but for defendant's refusal to permit Kaiser to compute contract production on the net basis. Defendant relies on Article VI of the contracts, which provides in pertinent part:

> (a) It is the intention of this Contract that the Government, by agreeing to purchase aluminum from the additional facilities as herein provided, guarantees the disposition of the entire output of the additional facilities to the extent of the Five Hundred Thousand (500,000) ton quantity specified in ARTICLE I, * * *.

and argues that since it was obligated to guarantee disposition of the entire output of the additional facilities, it is entitled to count all of the production of such facilities and therefore to include the pre-completion production. However, Article IV of the contracts provides in pertinent part:

> The Government may require the sale to it of all or any part of the aluminum produced from the additional facilities from the date of the beginning of commercial production and

prior to the date of completion of the facilities. * * * Any quantity of aluminum produced during this period shall not reduce the quantities otherwise specified in this contract, and specifically shall not be included as a portion of the Five Hundred Thousand (500,000) tons specified in ARTICLE I, * * *.

and Article I clearly defines "completion of construction" as follows:

> * * * The date of completion of construction of the additional facilities shall be the first day upon which ninety per cent (90%) of the electrolytic cells, which are to be constructed as a part of the additional facilities, are tapped. * * *

The pre-completion production involved here (112,906,000 pounds) occurred prior to the tapping of 90 percent of the electrolytic cells of the additional facilities under the Chalmette I and II contracts, and the evidence does not establish that Kaiser unreasonably delayed, but rather is it clear that it reasonably expedited its construction of the contract facilities. The parties obviously expected "pre-completion production" and expressly excluded the same from contract production in defining the extent of defendant's guarantee. The reason is obvious. Defendant wanted to accomplish the earliest possible production in the additional facilities to meet the great need of the nation for aluminum. Kaiser reasonably took advantage of contract provisions and produced aluminum, expressly not to be counted in contract production, by starting up a new potline as soon as it was ready, but before the date of completion of the additional facilities, as defined in the contract. This reasonable exercise of its contract right cannot now be held to defeat Kaiser's claim for damages.

In 1956, Kaiser commenced construction of aluminum reduction facilities, not involved in any contracts with defendant. A ninth potline was added at the Chalmette plant, which began operation on November 4, 1957, and two potlines were installed at the Ravenswood plant, which

were started on November 17, 1957, and January 20, 1958, respectively. When Kaiser commenced construction of these facilities in 1956, there was a sellers' market in aluminum, whereas by 1958, there was an oversupply. Of course, these new facilities contributed to the surplus of Kaiser plant facilities, which required shutdown of eight lines during 1958. Article VI of the contracts, after stating the Government's guarantee of disposition of the entire output of the additional facilities, continues as follows:

> * * * In this connection, it is recognized that Contractor now has other aluminum reduction facilities and may in the future acquire further aluminum reduction facilities other than those to be constructed under this Contract. It is understood that, except as to orders from the Government expressly placed pursuant to this Contract for aluminum to be produced at the additional facilities to be constructed under this contract, Contractor may first dispose of the production from such other facilities or utilize for its own purposes the production of such other facilities, before disposing of or utilizing aluminum from the additional facilities, and that, in accordance with ARTICLE III(c), the Government will purchase from Contractor all of the production of the additional facilities not otherwise disposed of or utilized by Contractor. The Government does not, by this contract, guarantee or agree to purchase production from other facilities.

Thus, it is apparent that the parties clearly understood that Kaiser retained the right to acquire further reduction facilities, and there is no basis in law or in fact to reduce or eliminate the stipulated damages on account of Kaiser's exercise of that right.

Regarding Kaiser's claimed damages for shutdown, standby and startup costs incurred on three of the eight potlines idled by economic conditions in 1958, the parties stipulated as follows:

> 5. If the court finds, as a matter of law, that plaintiff is entitled to damages on its claim for shutdown, standby, and startup, the court shall enter judgment in the amount of $247,566.-96.

Potlines 3 and 5 at Mead were shut down on April 5, 1958, and potline 3 at Chalmette on June 1, 1958. All three remained closed until August 8, 1958, when they were started again. The idle production capacity of these lines amounted to 41,133,000 pounds during their shutdown period. Had defendant purchased the 84,407,143 more pounds of aluminum, these three lines would have been operated continuously throughout the year 1958, in order to produce, in part, the additional 84,407,143 pounds, and Kaiser would not have incurred the shutdown, standby, and startup costs in the stipulated amount of $247,566.96. The evidence does not establish, as contended by defendant, that potline 3 at Chalmette was shut down for the purpose of conducting experimentation with a lithium bath instead of cryolite customarily used in the reduction cells, although it is true that when that line was restarted, such experimentation was conducted therein for a short period of time. The shutdown and idleness of this potline were clearly due to economic conditions and the efforts of Kaiser to mitigate its damages.

It is concluded that plaintiff is entitled to recover on its petition, and that judgment should be entered for plaintiff in the sum of $6,951,088.59 on the offgrade and alloy issues, and $247,-566.96 for shutdown, standby, and startup costs, or a total of $7,198,655.55, and defendant's counterclaims and plaintiff's request for affirmative relief in its reply to such counterclaims should be dismissed.

COLLINS, Judge, took no part in the decision of this case.