**CRAY RESEARCH, INC., Plaintiff,**

v.

**THE UNITED STATES, Defendant.**

**No. 95–564C.**

United States Court of Federal Claims.

July 23, 1998.

James D. Bachman, Washington, DC, for plaintiff.

Arnold M. Auerhan, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant.

**OPINION AND ORDER**

WEINSTEIN, Judge.

This case is before the court on cross-motions for summary judgment. Plaintiff demands damages for defendant's failure to make the last payment under a contract modification ("Mod 9") providing for the acquisition of a Cray Y–MP 8/432 computer system (the "Y–MP system").

Plaintiff claims that Mod 9 converted the underlying base agreement, for the lease or lease-to-ownership plan (LTOP) of Cray's X–MP computer system, into an installment purchase of the Y–MP system. Plaintiff claims that defendant breached the Y–MP purchase agreement (or terminated it for its own convenience)[1] by failing to make the final, fiscal year 1995 (FY95) payment. Defendant maintains that Mod 9 merely changed the lease deliverables and that the government properly exercised its contractual right not to renew the lease, on grounds of the government's "best interest" or the unavailability of funds, before the final FY95 payment.

Because Mod 9 is latently ambiguous when considered together with the contract as a whole and there are genuine issues of material fact requiring a fact finder's determination (*e.g.*, the (objective) intent of the parties at the time of the execution of this modification; industry practice; the course of dealing of the parties; and, if the ambiguity is found to be latent, whether plaintiff relied on its reading of the contract), the court denies both cross motions.

### *Facts*

The material facts set out below are not in dispute.

On or about June 29, 1987, the Central Intelligence Agency (CIA or government) awarded a LTOP contract for the acquisition of an X–MP computer system, including peripheral equipment, training, total system maintenance, and related technical assistance, under contract No. 87–W328700–000, to Cray Research, Inc. (Cray). The system

---

1. The damages presumably would be similar under either theory, assuming, as appears likely, that the Y–MP had no scrap value and plaintiff was not able to sell or lease it to another customer.

was delivered and accepted in December, 1987. The initial term of the X–MP contract ended September 30, 1988. It was anticipated that the government would use the system during its useful life of 72 months from the date of award, i.e., through FY93 (ending September 30, 1993). See Contract Clause F–4.5.[2]

The LTOP provided for an annual payment plan (Annual PP) with five annual renewal options, as well as options to acquire or lease additional equipment. The renewal options were to be evidenced by a modification to the contract. See Contract Clause H–10(b). In the event of non-renewal, the contractor was to keep the money paid to date and the machines were to be returned to the contractor "in the original condition as delivered, less ordinary wear and tear." Contract Clause H–10(c). Risk of loss was placed on the contractor. See Contract Clause H–10(d). Upon final payment, the government was considered to have purchased all the machines listed in the contract and "thereafter [to] have all the rights of ownership ... including title." Contract Clause H–10(a). Clause H–11, too, reflects that title was to remain with the contractor until final payment under the LTOP/Annual PP.

The statement of work for the base agreement provided for the procurement of a "system" including the main computer, a Model X–MP/24 Central Processor Unit, along with other enumerated items, but did not refer to a successor or replacement system. The deliverables included 14 items, including the X–MP, but no replacement system. The contractor was required merely to *propose* "additional items necessary for the [X–MP] system to process ... applications." Contract Clause C–2.2.1 ("Field Upgrades") also did not refer to any successor or replacement system.

The performance period for the base (X–MP) system was to begin on the installation date (the date when the contractor certified that it was ready) and system acceptance occurred when the system had met the stan-

dard of performance for 30 days. See Contract Clause C–5. Acceptance was conditioned "upon successful completion of the Inspection and Acceptance Tests." Contract Clause E–5. The system delivery and installation schedule specified the items covered and did not include a replacement system. See Contract Clause F.

The government had the option to purchase additional equipment, but the prices were to be determined by the contractor's proposal. See Contract Clause F–4.5.3. Again, no mention was made of replacing the entire system. Clause H–10, captioned "Lease to Ownership Annual Payment Plan," stated that the base lease or LTOP "is an agreement for acquisition of the *listed* machines." (Emphasis added). No replacement machine was listed. Clause H–10 also provided that "all the rights of ownership ... including title" would pass "upon final payment," and that during the term of the agreement the government could not "in any way encumber the machines."

The contractor was not obligated to provide substitute equipment, but retained the right to do so under Clause H–10(g), in the event the identified equipment was no longer available from the contractor. Part II of the contract incorporated by reference certain FAR clauses applicable to "Fixed Price Supply" contracts. As the government was aware, see Pl's Exh. 2 at 2.9.3 (discussing buyout of X–MP and Citicorp as assignee under contract), and as authorized by clause H–5 ("Assignment of Claims"), plaintiff "... assign[ed] its rights ... [to all unpaid amounts payable under the contract] to a financing institution."

The contract was modified nineteen times. Modifications 1 through 8 added equipment costing a total of $5,720,672. Subsequently, the CIA requested a proposal (purportedly pursuant to Clause F–4.5.3 of the contract ("Option for Additional Equipment"), which allowed the government to "purchase additional equipment as required") to provide a new computer system. Mod 9 purported to be entered into pursuant to clause F–4.5.3,

---

**2.** Section F–4.5 provided: "Although the government contemplated use of the system(s) (Hardware and Software) for the systems [sic] life of

72 months [6 years] from the date of award, the term ... shall be from the date of acceptance through September 30, 1988."

although this clause gave the government an option to purchase only "additional equipment," not a new system.

In 1989, at the government's request, plaintiff proposed to provide a Cray Y–MP system, at a total cost increase of $14,041,306 (from $18,077,798 under the base agreement to $32,119,104). This proposal, which culminated in Mod 9, offered an "alternate payment plan" (Alternate PP) of five annual payments, from November, 1990 (FY91) through November, 1994 (FY95).

Mod 9 provided (in pertinent part):

This modification provides for the purchase of a Y–MP8/432 Computer System and related peripherals under an Alternate Payment Plan (A[lternate] PP) whereby the Government is granted "encumbered" title after installation and acceptance of the equipment, with "clear" title passing after completion of the last [Alternate] PP payment. Any reference to a lease arrangement of any kind under this modification is invalid. . . .

Except as provided herein, all terms and conditions of the referenced contract, as heretofore changed, remain unchanged and in full force and effect.

Under Mod 9, the government agreed to pay the remaining lease payments for the X–MP directly to Citicorp, the assignee of Cray's income stream for the X–MP. Clause A–1, the "Type of Contract and Consideration" clause, was modified to increase the total price for performance by $14,041,306, from $18,077,798 to $32,809,128. After a "buy-out credit" of $232,178 for the government's purchase of the X–MP, the difference to be financed by Citicorp and paid in annual installments by the government was $13,809,-128.

The payment plan was revised by Mod 9, and later slightly modified by Mod 15, to provide for the following annual payments

for the Y–MP: FY90, $664,093; FY91, $2,678,153; FY92, $3,342,246; FY93, $4,603,-042; FY94, $4,603,042; FY95, $4,414,621, for a total of $20,305,197. Mod 9 also modified Clause B–1.1, ("Scope of Contract" and "Payment Schedule"), to identify the new total purchase price of $14,975,000 and to identify this as the "Amount to be Financed." Thus, the FY90, FY91, and FY92 payments equaled the remaining lease payments under the base agreement for the lease of the X–MP system. The total of the FY93, FY94, and FY95 payments equaled $13,620,705. This is approximately the total contract price for the Y–MP, $14,041,306, less a credit of $232,178, the APP buyout amount for the X–MP, or $13,809,128.[3]

In December, 1993, based on cost considerations and the change in equipment requirements resulting from the end of the cold war and the Soviet Union's concomitant break-up, the CIA's Associate Deputy Director for Intelligence decided that the Y–MP computer system was no longer needed. On August 5, 1994, the contracting officer (CO) notified Cray that the government did not intend to exercise its FY95 option (and thus would not make the $4,414,621 FY95 payment due in November, 1994).

By letter dated January 31, 1995, plaintiff submitted a claim for recovery of the FY95 payment for the Y–MP system, asserting that it was entitled, pursuant to FAR § 49.206–2, to the final $4,414,621 FY95 payment, plus interest, and, pursuant to FAR § 52.249–2(f)(3), to settlement expenses of $59,423.27 (representing expenses incurred through December, 1994 in pursuit of a termination settlement). See JPSR App. at 1.8–1.9. On May 12, 1995, after interviews with the original CO, Garrilyn Sprague,[4] and the drafter of Mod 9, the CO issued a final decision concluding that "Cray fully understood the conditional arrangement of the contract,"[5] and denying plaintiff's claim in its

---

3. The bulk of the difference of $188,423 represents a $140,000 prepayment made in FY91 to reduce the FY95 payment by $188,421. Pl's Exh. 2 at 2.15.2.

4. The CO's "initial assessment" was that Cray was not entitled to recover, but he "sought the counsel of an uninterested third party," John Cibinic, Professor Emeritus of Law of the George

Washington University, who purportedly confirmed that the CO's decision to deny Cray's claim was correct.

5. The contracting officer relied in part on Ms. Sprague's "recoll[ection] that Mr. Naylor [one of Cray's corporate contracts managers during the contract period] indicated that the terms and

entirety. Plaintiff's complaint here was filed on August 18, 1995.

The core question in this case is whether Mod 9 converted the LTOP lease agreement for the X–MP system into a purchase agreement for the Y–MP system. The court concludes that the contract is not patently ambiguous and that either party's arguments can be supported by the language of the contract.[6] Therefore, the court must look beyond the four corners of the contract, as modified. See NRM Corp. v. Hercules, Inc., 758 F.2d 676 (D.C.Cir.1985) (when search for contents extends beyond the four corners of the contract, intended meaning is disputed and summary judgment is inappropriate).

### The Contract Terms

The key contract provisions provided as follows:

Mod 9 provided:

This modification provides for the purchase of a Y–MP8/432 Computer System and related peripherals under an Alternate Payment Plan (A[lternate] PP) whereby the Government is granted "encumbered" title after installation and acceptance of the equipment, with "clear" title passing after completion of the last [Alternate] PP payment. Any reference to a lease arrangement of any kind under this modification is invalid. . . .

Except as provided herein, all terms and conditions of the referenced contract, as heretofore changed, remain unchanged and in full force and effect.

Mod 9 cited Clause H–9, but not Clause H–10, the provision that defendant finds most significant.

Contract clause H–9 stated (in pertinent part):

It is . . . understood that the government's obligation to make the . . . annual payments is predicated upon the availability of funds and determination that continuation of the [Annual Payment Plan] is in the best interest of the Government.

Contract clause H–10 (containing the Renewal Option) stated (in pertinent part):

This Lease to Ownership Annual Payment Plan (A[nnual] PP) is an agreement for acquisition of the listed machines under the terms, conditions, and provisions of this contract and the Contractor's Proposal. . . .

b. RENEWAL OPTION: The government shall have the option to renew this [Annual Payment Plan] for succeeding fiscal year renewal terms, and for the final renewal term terminating on the date of final payment. . . .

Renewals thereof shall be each successive Fiscal Year and shall be evidenced by a modification hereto, based on the Government's determination that the requirements still exists [sic] and that the renewal shall be in the best interests of the Government.

### The Dispute

Both parties agree that, prior to Mod 9, the contract was a LTOP or lease of the X–MP system.[7] Both parties also agree that, prior to Mod 9, defendant had the option, each fiscal year, to renew or decline to renew the lease based on: funding considerations, the best interests of the government, or changed circumstances.

Under the contract prior to Mod 9, title to the X–MP system did not pass until lease end, or upon a buyout according to the Prepayment Table contained in the plaintiff's proposal. Mod 9 significantly altered the

conditions had been fully reviewed by Cray's legal counsel."

6. The court notes that plaintiff's arguments regarding the meaning of Mod 9 are more convincing than defendant's, but not so clear as to permit summary judgment at this stage of the case.

7. That the base LTOP contract was a straightforward lease agreement rather than a purchase agreement, as the parties appear to concede, is

not clear as a matter of law. See, e.g., Government Systems Advisors, Inc. v. United States, 21 Cl.Ct. 400 (1990) (concluding that denominated LTOP created an "ownership arrangement" not just a lease agreement, even when title wouldn't pass until final annual payment), vacated on other grounds, 25 Cl.Ct. 554 (1990). However, the categorization of the pre-Mod 9 agreement as a lease or a LTOP does not appear relevant to the nature of the Mod 9 modification, the object of the inquiry here.

contract provisions governing passage of title. As discussed above, Mod 9, unlike the X–MP LTOP agreement, included language by which defendant automatically acquired title to the Y–MP system immediately upon installation and acceptance of the equipment. As for the X–MP/216 components defendant retained for use with the Y–MP system, defendant paid a buyout amount of $5,936,678, according to Mod 9, to obtain title, offset by plaintiff's extension of a $5,704,500 credit to defendant,[8] for a net buyout payment by defendant of $232,178, which was applied as a credit under the Y–MP purchase plan.

Plaintiff asserts that the title passage provisions of Mod 9, as well as Mod 9's amendments to Clauses A–1 ("Type of Contract and Consideration") and B.1.1 ("Scope of Contract"), indicated that the parties intended to enter into a contract for the purchase of the Y–MP system. Plaintiff points to Mod 9's "significantly different title transfer provisions for the Y–MP computer system," under which the Government took 'encumbered' title to the Y–MP system after installation and acceptance, with 'clear' title passing after completion of the final Y–MP fiscal year payment. Plaintiff argues that this indicates that an outright purchase of the equipment was intended, even though the payment for the purchase was to be made by installments, since ownership generally follows title. *See, e.g., Owen v. Owen,* 500 U.S. 305, 308, 111 S.Ct. 1833, 114 L.Ed.2d 350 (1991) (citing *Long v. Bullard,* 117 U.S. 617, 6 S.Ct. 917, 29 L.Ed. 1004 (1886)) ("Legal title will pass, . . . but the property will remain subject to the lien interest of the mortgage holder."). Plaintiff points to Mod 9's express removal from the contract of all references to leases as evidence that Mod 9 was intended to eliminate contract clause H–10 (entitled "Lease to Ownership Annual Payment Plan"), which contained defendant's renewal option under the LTOP. If H–10 were deleted from the Y–MP contract, as plaintiff argues was intended by Mod 9's removal of references to leases, then defendant no long-

er had the option not to renew the contract or to refuse to make the scheduled FY-end annual installment payments.

Defendant argues that Mod 9 either continued the lease nature of the contract or, alternatively, converted the lease contract to a one-year purchase agreement with an annual option to renew. Defendant's argument relies on the statement in Mod 9 that: "Except as provided herein, all terms and conditions of the referenced contract, as heretofore changed, remain unchanged and in full force and effect." Defendant contends that this phrase is not mere boilerplate language routinely added to all government contract modifications. *Cf. Teledyne Lewisburg v. United States,* 699 F.2d 1336, 1352 (Fed.Cir. 1983) ("[a]s do all contract amendments, the modification provided that 'except as modified herein all terms and conditions of the contract remain unchanged' "). In his final decision, the CO opined that this phrase indicated that the parties did not intend to change the lease nature of the agreement. The CO also stated that removing all references to "lease" and "LTOP" from the contract, as Mod 9 provides, still leaves references to an Annual Payment Plan in clause H–10, thereby giving continuing meaning to clause H–10, notwithstanding Mod 9's establishment of an *Alternate* Payment Plan.

Defendant contends, in the alternative, that the lack of any express reference in Mod 9 to contract clause H–10, containing the annual renewal option, results in a patent ambiguity as to which plaintiff was required to seek clarification. *See Fortec Constructors v. United States,* 760 F.2d 1288, 1291 (Fed.Cir.1985) (discussing plaintiff's duty to seek clarification); *Newsom v. United States,* 230 Ct.Cl. 301, 676 F.2d 647, 649 (1982) (same). Plaintiff's failure to do so, defendant argues, requires Mod 9 to be read against plaintiff. Defendant argues that the use of "renewal" language in the three fiscal year funding modifications following Mod 9 (Mods 10, 13 and 15, authorizing payments for FY90, FY91 and FY92, respectively) also in-

---

8. To obtain title to the X–MP components, defendant had to pay Citicorp $5,936,678 (the buyout amount effective December 29, 1989). Plaintiff agreed to pay Citicorp $5,936,678 on defendant's behalf, and defendant subsequently paid plaintiff $232,178 (the difference between the buyout amount and the credit plaintiff extended to defendant). Following these payments, defendant acquired clear title to the X–MP/216 and then conveyed its rights to plaintiff.

dicates that Mod 9 was not intended to change the lease character of the underlying agreement. These modifications, however, appear to primarily have allotted funding, and used "boiler-plate" language to do so. The three modifications contained the following paragraph, with minor variations addressing other aspects of the respective modification, to allot fiscal year funding:

This document constitutes Modification Number [Ten, Thirteen, Fifteen] to the subject contract and is issued for the purpose of: (a) exercising the Government's Option to Renew this contract for [FY90, FY91, FY92]; (b) extending the period of performance ... as a result of exercising the option; (c) providing funds for the payment of the Fiscal Year [FY90, FY91, FY92] ...; and (e) increasing the full funding allotment and obligation accordingly.

Pl's Exh. 2 at 2.10.2, 2.13.2, 2.15.2.

Plaintiff maintains that the subsequent "modifications" were intended merely as payment vouchers, and that the inclusion of the language under which annual payments prior to Mod 9 were made is not material, and was never considered by personnel with contracting authority, but only by ministerial functionaries such as bookkeepers or finance people. Plaintiff argues that the CO's decision concluding that the parties "did intend to change the time at which title to the computer passed," and asserting that the parties by Mod 9 intended to delete defendant's H–10 renewal option, provides further support for plaintiff's position.

Defendant here, like the CO, concludes that, even if Mod 9 effectively deleted clause H–10 from the contract, clause H–9 provided an equivalent option right, as it stated that "the Government's obligation to make the ... annual payments is predicated upon the availability of funds *and* determination that continuation of the APP is in the best interest of the Government." (Emphasis added.) However, it appears that funds were in fact available and, according to plaintiff, the best interest clause referred merely to the government's right to terminate for convenience.

The CO viewed Mods 17 and 18 as evidence of defendant's exercise of a renewal option on the contract. Plaintiff argues that Mods 17 and 18 are consistent with its contention that Mod 9 converted the contract from a lease of the X–MP to a purchase of the Y–MP system because defendant unilaterally allocated funding for Mods 17 and 18, unlike for earlier ones. Plaintiff also points out that these mods (as compared with the earlier post-Mod 9 modifications—Mods 10, 13 and 15) did *not,* by their terms, purport to exercise an annual lease renewal option.

### Discussion

Summary judgment is appropriate when the court finds both that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rules of the United States Court of Federal Claims (RCFC) 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). There is a material issue of disputed fact when a reasonable finder of fact could return a verdict in favor of the non-movant. *See Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1562 (Fed.Cir.1987). The fact that both parties have requested summary judgment is not dispositive as to whether summary judgment is appropriate. *See Prineville Sawmill Co., Inc. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390 (Fed.Cir.1987)).

Contract interpretation is a question of law to be decided by the court, and is amenable to summary judgment. *See Muniz v. United States,* 972 F.2d 1304, 1309 (Fed. Cir.1992); *P.J. Maffei Bldg. Wrecking Corp. v. United States,* 732 F.2d 913, 916–17 (Fed. Cir.1984). When interpreting a contract, the court looks first to the plain meaning of the contract. *See Aleman Food Servs., Inc., v. United States,* 994 F.2d 819, 822 (Fed.Cir. 1993); *Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir.1991). The court construes the meaning of particular terms, not according to the actual intentions of the parties at the time but, rather, objectively, as would a "reasonably intelligent person acquainted with the contemporaneous circumstances." *Hol–Gar Mfg. Corp. v. United*

*States,* 169 Ct.Cl. 384, 351 F.2d 972, 975 (1965). The court must give reasonable meaning to all parts of the contract, and not render any portion meaningless. *Fortec,* 760 F.2d at 1292; *Thanet Corp. v. United States,* 219 Ct.Cl. 75, 591 F.2d 629, 633 (1979).

If parties to a contract dispute the meaning of words in the contract, the court employs the following analysis. First, the court considers the plain language of the contract. *Northrop Grumman Corp. v. Goldin,* 136 F.3d 1479, 1483 (Fed.Cir.1998); *Gould,* 935 F.2d at 1274. Next, the court determines whether the words, given their ordinary meaning, create an ambiguity. *See John C. Grimberg Co., Inc. v. United States,* 7 Cl.Ct. 452, 456 (1985), *aff'd without opinion,* 785 F.2d 325 (Fed.Cir.1985). "A contract is ambiguous if it is susceptible of two different and reasonable interpretations, each of which is found to be consistent with the contract language." *Community Heating & Plumbing Co., Inc. v. Kelso,* 987 F.2d 1575, 1579 (Fed.Cir.1993) (citations omitted). If a contract term is unambiguous, the court cannot assign it another meaning, no matter how reasonable it may appear. *Triax Pacific, Inc. v. West,* 130 F.3d 1469, 1473 (Fed.Cir. 1997) (citing *R.B. Wright Constr. Co. v. United States,* 919 F.2d 1569, 1572–73 (Fed.Cir. 1990)).

A contract will be interpreted to fulfill the principal objective purposes of the parties, since one party's subjective, unwritten intent cannot bind the other party. *See Firestone Tire & Rubber Co. v. United States,* 195 Ct.Cl. 21, 444 F.2d 547, 551 (1971); *Singer–General Precision, Inc. v. United States,* 192 Ct.Cl. 435, 427 F.2d 1187, 1193 (1970).

Interpreting the contract as a whole, *see Fortec,* 760 F.2d at 1292, the court concludes that Mod 9's incorporation of both lease and purchase language, its purported deletion of lease references elsewhere in the contract, and the use of inconsistent language in later contract modifications, viewed in conjunction with the lease provisions of the base contract, make the parties' agreement, as modified by Mod 9, ambiguous. *See Grumman Data Sys. Corp. v. Dalton,* 88 F.3d 990, 997 (Fed.Cir.1996) ("If more than one meaning is reasonably consistent with the contract language, then the contract term is ambiguous").

An ambiguity may be patent or latent. *See Newsom,* 676 F.2d at 650. A patent ambiguity is one that is apparent from the face of the contract; a latent ambiguity becomes evident when, considered in light of the objective circumstances, two conflicting interpretations appear reasonable. *ITT Arctic Servs., Inc. v. United States,* 207 Ct.Cl. 743, 524 F.2d 680, 692 (1975). If the ambiguity is patent, the plaintiff has the duty to seek its clarification. *Newsom,* 676 F.2d at 650; *S.O.G. of Arkansas v. United States,* 212 Ct.Cl. 125, 546 F.2d 367, 369 (1976). If the plaintiff has not done so, the court will construe the ambiguity against the plaintiff. *Id.* at 371.

A latent ambiguity, under the rule of *contra proferentum,* will be construed against the drafter of the contract, provided that (1) the non-drafting party's interpretation is reasonable, *Community Heating,* 987 F.2d at 1579; *J.W. Bateson Co., Inc. v. United States,* 196 Ct.Cl. 531, 450 F.2d 896, 902 (1971); *Perry & Wallis, Inc. v. United States,* 192 Ct.Cl. 310, 427 F.2d 722, 726 (1970), and (2) the non-drafting party has reasonably relied on its interpretation, *Froeschle Sons, Inc. v. United States,* 891 F.2d 270, 272 (Fed.Cir.1989).

The contracting officer's final decision on the effect of Mod 9, although not entitled to deference, illustrates, by its distinct ambivalence, the ambiguity created by Mod 9. While the CO decided that the contract as modified by Mod 9 was unambiguous, he went on to consider (and reject) the doctrine of *contra proferentum,* which applies only to a latently ambiguous contract. *See, e.g., Community Heating,* 987 F.2d at 1579. The CO rejected the application of *contra proferentum,* not because the contract was unambiguous, but because "Cray fully understood the conditional arrangement of the contract," and based on "the circumstances surrounding the transaction."

Because the doctrine of *contra proferentum* does not apply to unambiguous con-

tracts, it is unclear how the CO reconciled this fact with his finding of no ambiguity. Nor does the CO cite any rationale or authority for refusing to read a latently ambiguous contract against the drafter merely because the non-drafting party was "sophisticated." The relevant distinction is not whether a party is "sophisticated," but whether the ambiguity itself is patent, "so glaring as to raise a duty to inquire," *Newsom,* 676 F.2d at 650, or latent, and thus should be construed against the drafter if the non-drafting party's interpretation is reasonable and the non-drafting party reasonably relied on its interpretation, *see Froeschle Sons,* 891 F.2d at 272.

The court concludes that the ambiguity here is latent because it is not obvious from the face of the contract and the modifications thereto. *See Grumman Data,* 88 F.3d at 997 (citations omitted) (whether an ambiguity is latent or patent is a question of law to be decided on a case-by-case basis; a patent ambiguity is obvious, gross, or glaring). *See also Charter Oil Co. v. American Employers' Ins. Co.,* 69 F.3d 1160, 1167 (D.C.Cir.1995) (citations omitted) (latent ambiguity can arise "where language, clear on its face, fails to resolve an uncertainty when juxtaposed with circumstances in the world that the language is supposed to govern"). This is precisely what has occurred here—it is not clear whether the government's failure to make the final payment constituted an exercise of a lease option, or a breach of its obligation to make the final installment payment on a sale. Clearly, the parties did not envision or take into account this eventuality,[9] any more than politicians at the time were able to predict the imminent end of the cold war and collapse of the Soviet Union.

If a written contract is unclear, or not integrated, prior or contemporaneous extrinsic evidence that does not contradict the written language of the contract may be introduced to establish its meaning. *See Sylvania Elec. Prods., Inc. v. United States,* 198 Ct.Cl. 106, 458 F.2d 994, 1005 (1972). *See also United States v. National Steel Corp.,* 75 F.3d 1146, 1149 (7th Cir.1996) (Posner, C.J.) (extrinsic evidence (beyond the contract itself) may be taken if there is either an intrinsic or extrinsic ambiguity; intrinsic ambiguity "is present when from just reading the contract it is apparent that the contract is unclear"; extrinsic ambiguity "is present when although the contract is clear at the semantic or literal level, anyone who knew something about the subject matter would realize that the contract probably didn't mean what it said."). Evidence regarding pre-dispute actions and interpretations made known to the other party may be admissible for this purpose. *Perry & Wallis, Inc.,* 427 F.2d at 726. Evidence regarding a contract term does not violate the parol evidence rule if it does not contradict the clear meaning of the term. Extrinsic evidence generally may not be used to establish an ambiguity nor to establish actual intent of the parties. Moreover, if external evidence is needed to interpret the contract, that case is not amenable to summary judgment. *See Beta Systems, Inc. v. United States,* 838 F.2d 1179, 1183 (Fed.Cir.1988) (citing S. Williston, A Treatise on the Law of Contracts § 616, at 649, 652 (3d Ed.1961)).

The extrinsic evidence of the parties' objective intent at the time of the execution of Mod 9 is itself ambiguous. This is evident from the conflicting deposition testimonies of two government witnesses, Gemma Berdahl, defendant's negotiator on Mod 9, and Caldwell Vordenbaumen, the contracting officer at the time defendant opted not to renew the contract. Significantly, Ms. Berdahl stated several times that she believed Mod 9 was

---

9. Citicorp financed defendant's 1989 acquisition of the Y–MP system in response to plaintiff's request to do so. Marc Bastow, Citicorp's relationship manager for this transaction, testified that the parties priced the Mod 9 transaction on the basis that defendant did not have the right of an annual renewal option and that the transaction price with the renewal option would have been "significantly higher," "[a]nywhere from 2 to 300 basis points." Pl's Exh. 17 at 76. In addition, Mr. Bastow used a term sheet that stated "[defendant] will have the right to terminate for non-appropriation of funds or convenience." Pl's Exh. 17, Exh. 2 at 3. In addition, Lee Weiner, plaintiff's contract administrator, testified that she understood that the government could terminate the contract only if "Congress did not appropriate funds ... [or] for its convenience." Pl's Exh. 18 at 183.

for the *purchase* of the Y–MP, Pl's Exh. 15 at 40, 53, 95, 102; Mr. Vordenbaumen, however, maintained that Mod 9 did not affect the *lease* nature of the contract, Pl's Exh. 9 at 181.

Mr. Vordenbaumen relied on the General Services Administration Guidance to the Standard Solicitation Document for ADP Equipment Systems ("GSA Guidance") as support for his view that the contract, as amended by Mod 9, was conditional and most closely resembled a lease. Pl's Exh. 9 at 48–50, 199. (Ms. Berdahl asserts that she, too, relied on the GSA Guidance in preparing Mod 9. JPSR App. at 5.10.) Nevertheless, elsewhere, Mr. Vordenbaumen concedes that Mod 9 had characteristics of both a lease and a purchase, Pl's Exh. 9 at 36. However, the GSA Guidance itself states that Installment Purchase Plans (IPPs) or Alternate PPs are variations of a LTOP, and notes that "the Government is sometimes granted 'encumbered' title after installation and acceptance of equipment, with 'clear' title passing at the end of the contract." JPSR App. at 5.10 (quoting GSA Guidance). This appears to describe the title transfer provisions in Mod 9.

Mr. Vordenbaumen's conclusion that Mod 9 was not a sales contract also relied on the Uniform Commercial Code (UCC) financing statement filed by plaintiff, which indicated that plaintiff retained unencumbered title to the Y–MP, and thus that plaintiff did not in fact transfer title to defendant. JPSR App. at 5.9.

On the other hand, one of plaintiff's contract managers, Lee Weimer, stated in her deposition that the parties intended Mod 9 to express defendant's unconditional promise to purchase the Y–MP from plaintiff. Also, the applicability of the GSA Guidance to this contract is not clear from either the contract or the terms of the Guidance. In addition, the GSA Guidance could be viewed as self-serving, to re-cast purchase transactions so as to circumvent restrictions on the government's ability to enter into multi-year purchase contracts that exceed amounts appropriated or funded, created by appropriations laws such as the Anti–Deficiency Act, 31 U.S.C. § 1341, as well as by other Congressional restrictions. *See, e.g.,* 41 U.S.C. § 254c (defining "multiyear contract" and stating that such contracts may provide that contract performance will be contingent upon appropriation of funds).

Mr. Vordenbaumen, the contracting officer at the time defendant declined to renew the contract, contended, both in his deposition and in his final decision, that Mod 9 did not eliminate defendant's annual option to renew the contract, even though it did not incorporate or reference H–10 ("Lease to Ownership Annual Payment Plan"), the clause that set out the renewal option. Pl's Exh. 9 at 73–74, 196–98; JPSR App. at 5.8. He also stated that defendant had broad discretion not to renew the contract if funds were unavailable or renewal was found not to be in the best interest of the government. Pl's Exh. 9 at 197; JPSR App. at 5.8. Both Mr. Vordenbaumen and Ms. Berdahl maintained that, since Mod 9 specifically incorporated and did not delete clause H–9 ("Full Contract Funding Allotment and Obligation"), the renewal option clause, Clause H–10, too, was intended to be incorporated into Mod 9, Pl's Exh. 15 at 76, 79–80, and that defendant retained the authority not to renew based on Clause H–9 rather than on Clause H–10.

Cray and Citicorp personnel disagree with defendant's interpretations of the effect of Mod 9 on the government's renewal option. Lee Weimer, the Cray contracts administrator for special systems contracts at the time Mod 9 was drafted (and Cray's Mod 9 negotiator), testified that she understood Mod 9 to convert the contract to a purchase *without* an annual renewal option. Pl's Exh. 18 at 182–84. Likewise, Marc Bastow, a regional sales manager at Citicorp when Mod 9 was negotiated, and now a Citicorp vice president, testified in his deposition that Citicorp and Cray priced their financing transaction of defendant's acquisition of the Y–MP based on the condition that defendant was purchasing the system and did *not* have an annual renewal option. He testified that the Y–MP transaction exposed them to only two termination risks—(1) termination due to lack of Congressional appropriation of funds and (2) termination for convenience, and that, if such an option had existed, Cray would have priced

the transaction significantly higher. Pl's Exh. 17 at 75–76. *See Winstar Corp. v. United States*, 64 F.3d 1531, 1540 (Fed.Cir. 1995) ("the principal objective in deciding what contractual language means is to discern the parties' intent at the time the contract was signed"), *aff'd*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). The CO's final decision, on the other hand, asserted that Congress' direction to reduce defendants' expenditures in the specific appropriations pool that funded this contract justified defendant's decision not to renew as due to a lack of appropriated funds. JPSR App. at 5.8.[10]

The depositions also do not provide a consistent picture of the parties' understanding of defendant's contract termination options after Mod 9 was signed. Defendant believes that, even after Mod 9, defendant retained, in addition to the traditional methods of contract termination, the right not to renew the contract at the end of each annual period if this were in the best interest of the government, broadly defined, under Clause H–9. Pl's Exh. 9 at 37, 231.

Plaintiff's contract administrator, however, contends that after Mod 9 defendant was limited to: (1) terminating the contract for a lack of available funds allocated by Congress, (2) terminating the contract for its convenience, or (3) terminating the contract for default. In her view, the "best interest" clause of H–10 was intended merely to confirm defendant's option to terminate for convenience. Pl's Exh. 18 at 183–84. The parties agree that Congress did not expressly direct defendant not to make the FY95 payment. Pl's Exh. 38 at 38–10; Pl's Exh. 39 at 39–1. Plaintiff nevertheless argues that defendant had appropriated funds available to continue funding the Y–MP system, since defendant apparently had ample funds to secure a replacement system to perform the Y–MP functions, Pl's Exh. 32 at 22–25 (discussing CIA's purchase of Silicon Graphics machine in 1994 that performed some of Y–

MP functions), and Congress did not direct the agency to discontinue Y–MP funding, See Pl's Exh. 33, 34, 35, 36, 37. Also, defendant's internal memoranda addressing its options with respect to FY–95 Y–MP funding, including the advantages and disadvantages of continuing to use the Y–MP, suggested that defendant's decision to stop using the Y–MP was based, in part, on a comparison between using the Y–MP and using the Silicon Graphics (SGI) platform, Pl's Exh.33 at 33–8, 33–10, in addition to budgetary concerns.

▮ A termination for convenience clause provides a government escape clause that is available at the CO's discretion. *See Torncello v. United States*, 231 Ct.Cl. 20, 681 F.2d 756, 767 (1982) (discussing *Colonial Metals Co. v. United States*, 204 Ct.Cl. 320, 494 F.2d 1355 (1974)). The termination for convenience concept arose from the unpredictable nature of wartime procurements, and now serves to reduce governmental liability for breach of contract by allocating a share of the risk to the contractor. *See Maxima Corp. v. United States*, 847 F.2d 1549, 1552 (Fed.Cir.1988). However, the government cannot reserve the right to terminate a contract unilaterally in a manner that makes the contract illusory. *See Winstar*, 518 U.S. at 895, 116 S.Ct. 2432 ("[w]hen the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals") (quoting *Lynch v. United States*, 292 U.S. 571, 579, 54 S.Ct. 840, 78 L.Ed. 1434 (1934)); *Torncello*, 681 F.2d at 768.

▮ Courts apply the doctrine of constructive termination for convenience "when the basis upon which a contract was actually terminated is legally inadequate to justify the action taken." *Maxima*, 847 F.2d at 1553. The government, however, may terminate a contract for its convenience only in the event of a change in the circumstances of the contract or in the parties' expectations. *Id.*

---

10. The CO decision stated that "[t]he Congressional staff having cognizance over the projects supported by the Y–MP advised the Agency to make sizable reductions in the expenditures and programs that were funded out of that larger appropriations pool." JPSR App. at 5.8. The

CO therefore believed that defendant no longer had funds available to continue the Y–MP program. Purportedly in response to this advice, agency management eliminated Y–MP funding in order to comply with this "Congressional guidance." *Id.*

(citing *Municipal Leasing Corp. v. United States*, 7 Cl.Ct. 43, 47 (1984)). If "best interest" is broadly construed, defendant's termination of the contract on this ground is merely an actual or constructive termination for the government's convenience, entitling plaintiff to termination for convenience damages.[11]

The court finds that it cannot resolve the conflicting interpretations of the significance of Mod 9 without considering extrinsic evidence. The court must assess the credibility of the witnesses who can testify, *e.g.*, as to the parties' communicated intentions at the time Mod 9 was negotiated, the course of dealings between the parties before this dispute arose, and whether plaintiff reasonably relied on its interpretation, *see Fruin–Colnon Corp. v. United States*, 912 F.2d 1426, 1432 (Fed.Cir.1990); *Froeschle Sons*, 891 F.2d at 272 (citing *United States v. Turner Constr. Co.*, 819 F.2d 283, 285 (Fed.Cir.1987)). *See Interwest Constr. v. Brown*, 29 F.3d 611, 617 (Fed.Cir.1994) ("evidence of other bidders' interpretations of the contract considered in determining the reasonableness of a contractor's interpretation of latent ambiguity") (citing *Community Heating*, 987 F.2d at 1579); *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir.1988) (citations omitted) ("judge [may not] make credibility determinations with respect to statements made in affidavits, answers to interrogatories, admissions, or depositions").

Expert testimony regarding government and industry practice in entering into and performing such agreements, or the meaning of terms of art in the contract or the mod may prove relevant. *See Johnston v. IVAC Corp.*, 885 F.2d 1574, 1579 (Fed.Cir.1989) (citing *Howes v. Medical Components, Inc.*, 814 F.2d 638, 643 (Fed.Cir.1987) ("if complex scientific principles are involved or expert testimony is needed to explain a disputed

term, for example, then an underlying factual question may arise which makes summary judgment improper")); *McGill Inc. v. John Zink Co.*, 736 F.2d 666, 672 (Fed.Cir.), *cert. denied*, 469 U.S. 1037, 105 S.Ct. 514, 83 L.Ed.2d 404 (1984); *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753 (Fed.Cir.1984) (if meaning of term of art in the claims is disputed, and extrinsic evidence is needed to explain the meaning, construction of the claims could be left to fact finder). *See also Alfred A. Altimont, Inc. v. United States*, 217 Ct.Cl. 628, 579 F.2d 622, 625 (1978) ("the bargain between the parties is one that is drawn with the trade standards and practices of the relevant business community in mind").

Even the question of whether there was an agreement requires factual findings. *See Ransom v. United States*, 900 F.2d 242, 244 (Fed.Cir.1990) (whether a contract existed is a mixed question of law and fact) (citing S. Williston, 4 Williston on Contracts § 616, at 648–49 (W. Jaeger 3d ed.1961)). *See also Old Colony Trust Co. v. City of Omaha*, 230 U.S. 100, 118, 33 S.Ct. 967, 57 L.Ed. 1410 (1913) (practical interpretation of parties is of great if not controlling influence in interpreting contract).

### *Conclusion*

Because the court must hear extrinsic evidence regarding the intended terms of this ambiguous contract, assess the credibility of witnesses on this point, and make inferences from the facts, this dispute is not amenable to summary judgment. *See Global Network Technologies, Inc. v. Regional Airport Auth.*, 122 F.3d 661 (8th Cir.1997) (when latent ambiguity exists "court must then consider parol evidence such as ... facts and circumstances surrounding execution of the contract...."); *Beta Systems, Inc.*, 838

---

11. Plaintiff bears the burden of proving termination for convenience damages. *See Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 767 (Fed.Cir.1987); FAR 31.201–3(a). *See also Bath Iron Works Corp. v. United States*, 34 Fed.Cl. 218, 231 (1995), *aff'd*, 98 F.3d 1357 (Fed.Cir. 1996). The costs in a termination for convenience recovery must satisfy the general requirements of FAR Part 31 and be allowable, reasonable, and allocable. *See* FAR § 49.113 (stating

that the cost principles in FAR Part 31 should be used to determine costs relevant to termination settlements); FAR §§ 31.201–2, 31.201.3, 31.201–4 (describing the requirements of allowability, reasonableness and allocability, respectively); FAR § 31.205–42 (describing cost principles "peculiar to termination situations"). The question of damages in this case is well-suited for decision by a fact finder.

F.2d at 1183; *National Surety Corp. v. United States*, 31 Fed. Cl. 565, 572 n. 6 (1994).

Accordingly, the court denies both parties' cross-motions for summary judgment. The parties shall jointly prepare and submit a proposed schedule for further proceedings on or before August 3, 1998.