CRAY RESEARCH, INC., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 95–564C.

United States Court of Federal Claims.

June 16, 1999.

James D. Bachman, Alexandria, VA, for plaintiff, Alison L. Doyle, Washington, D.C., of counsel.

Bryant S. Banes, Washington, D.C., with whom were Acting Assistant Attorney General David W. Ogden and Director David M. Cohen, for defendant.

### Opinion and Order

WEINSTEIN, Judge.

This case, brought pursuant to the Contract Disputes Act, 41 U.S.C. § 609, concerns a contract between plaintiff and the Central Intelligence Agency (CIA or government) for the acquisition of a Cray Y–MP 8/432 computer system (Y–MP). On July 23, 1998, the court denied the parties' cross-motions for summary judgment. *See Cray Research, Inc. v. United States,* 41 Fed.Cl. 427 (1998). The court assumes familiarity with this decision. Trial was held on December 15–17, 1998, in Washington, D.C. The parties filed post-trial briefs on February 1, 1999.

Based on its consideration of the trial testimony and the parties' pre- and post-trial briefs, the court concludes that plaintiff's claims do not merit relief. Accordingly, for the reasons discussed below, the court grants judgment in favor of defendant.

### Background

On June 29, 1987, the CIA awarded plaintiff a lease-to-ownership plan (LTOP) contract for the acquisition of an X–MP–24 computer system (X–MP) and related peripheral equipment. P1.2–3.[1] The contract's firm fixed-price was $12,803,181. P1.2.

Section H–10 of the contract contains an annual payment plan (Annual PP) for the X–MP purchase price. The Annual PP establishes an initial one-year term with five annual renewal options. P1.44–46. Renewals are evidenced by a modification to the contract, "based on the Government's determination that the requirements still exists [sic] and that the renewal shall be in the best interests of the Government." P1.45. Title remains with the contractor until the final installment payment. P1.44, P1.47. In the event of non-renewal, the contractor keeps all money previously paid and the equipment is returned to the contractor. P1.45. "Nonrenewal [does] not obligate the Government for any additional charges." P1.45.

---

1. "P___" and "D___" refer, respectively, to plaintiff's and defendant's trial exhibits, and provide the exhibit number followed by the relevant page number(s) of that exhibit. "T__" refers to the trial transcript.

Section H–9 provides that "the Government's obligation to make ... annual payments is predicated upon the availability of funds and determination that continuation of the A[nnual] PP is in the best interest of the Government." P1.44. In addition, the government is not responsible for any payments "unless and until funds are made available to the Contracting Officer ... and notice of such availability ... is given to the Contractor." P1.44. Consistent with sections H–9 and H–10, section F–4.5 specifies a contract term of one year, "from the date of acceptance through September 30, 1988." P1.35.

On July 20, 1989, plaintiff proposed replacing the X–MP with a Cray Y–MP computer system. D71.1. This proposal culminated in modification 9 (Mod 9) to the contract, which "upgrade[d]" the X–MP to a Y–MP. P10.2. Mod 9 increased the total contract price by $14 million to $32 million, approximately.

Mod 9 provides (in pertinent part):

This modification provides for the purchase of a Y–MP8/432 Computer System and related peripherals under an Alternate Payment Plan (A[ltenate] PP) whereby the Government is granted "encumbered" title after installation and acceptance of the equipment, with "clear" title passing after completion of the last A[lternate] PP payment. Any reference to a lease arrangement of any kind under this modification is invalid....

Except as provided herein, all terms and conditions of the referenced contract, as heretofore changed, remain unchanged and in full force and effect.

P10.2, 10.9.

In December, 1993, based on cost considerations and a change in equipment requirements resulting from the Soviet Union's break-up, the CIA decided that the Y–MP was no longer needed. P35, P37. On August 5, 1994, the contracting officer notified plaintiff that the CIA did not intend to exercise its FY95 option. P38.1.

On January 31, 1995, plaintiff submitted a claim to the contracting officer for $4,474,-044.27, representing the FY95 payment for the Y–MP, plus interest. P39. On May 12, 1995, the contracting officer denied plaintiff's claim. P41.12. Plaintiff filed its complaint here on August 18, 1995.

### Lease or Purchase

The parties agree that, prior to Mod 9, the contract was an LTOP or a lease of the X–MP system. The parties also agree that, prior to Mod 9, defendant had the option, each fiscal year, to renew or decline to renew the lease, based on funding considerations, the best interests of the government, or changed circumstances.

Plaintiff asserts that the title passage provisions of Mod 9, under which the Government took "encumbered" title to the Y–MP system after installation and acceptance, with "clear" title passing after the final fiscal year payment, indicate that the parties intended to enter into a contract for the outright *purchase* of the Y–MP system, even though payment was to be made by installments. In addition, plaintiff points to Mod 9's express removal from the contract of all references to leases, as evidence that Mod 9 was intended to eliminate contract section H–10, which contained defendant's renewal option under the LTOP.

Defendant argues that Mod 9 either continued the lease nature of the contract or, alternatively, converted the lease contract to a one-year purchase agreement with an annual option to renew. Defendant states that, although Mod 9 eliminates all references to "lease" from the contract, section H–10 still provides an annual option to renew. In addition, defendant contends that, even if Mod 9 deleted section H–10 from the contract, section H–9 provides an equivalent option right by predicating annual payments on both the availability of funds and a determination that continuation is in the best interests of the government.

### Applicable Law

■■■ When interpreting a contract, the court looks first to its plain meaning. *See Aleman Food Servs., Inc. v. United States,* 994 F.2d 819, 822 (Fed.Cir.1993); *Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed. Cir.1991). The court construes the meaning of particular terms, not according to the actual intentions of the parties at the time but, rather, objectively, as would a "reasonably

intelligent person acquainted with the contemporaneous circumstances." *Hol–Gar Mfg. Corp. v. United States*, 169 Ct.Cl. 384, 351 F.2d 972, 975 (1965). The contract will be interpreted to fulfill the principal objective purposes of the parties, since one party's subjective, unwritten intent cannot bind the other party. *See Firestone Tire & Rubber Co. v. United States*, 195 Ct.Cl. 21, 444 F.2d 547, 551 (1971); *Singer–General Precision, Inc. v. United States*, 192 Ct.Cl. 435, 427 F.2d 1187, 1193 (1970). The court must give reasonable meaning to all parts of the contract, and not render any portion meaningless. *See Fortec Constructors v. United States*, 760 F.2d 1288, 1292 (Fed.Cir.1985); *Thanet Corp. v. United States*, 219 Ct.Cl. 75, 591 F.2d 629, 633 (1979).

▬ If parties to a contract dispute the meaning of words in the contract, the court employs the following analysis. First, the court considers the contract's plain language. *See Northrop Grumman Corp. v. Goldin*, 136 F.3d 1479, 1483 (Fed.Cir.1998); *Gould*, 935 F.2d at 1274. Next, the court determines whether the words, given their ordinary meaning, create an ambiguity. *See McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1434–35 (Fed.Cir.1996). "A contract is ambiguous if it is susceptible of two different and reasonable interpretations, each of which is found to be consistent with the contract language." *Community Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575, 1579 (Fed. Cir.1993) (citations omitted). If a contract term is unambiguous, the court cannot assign it another meaning, no matter how reasonable it may appear. *See Triax Pacific, Inc. v. West*, 130 F.3d 1469, 1473 (Fed.Cir.1997) (citing *R.B. Wright Constr. Co. v. United States*, 919 F.2d 1569, 1572–73 (Fed.Cir. 1990)).

▬ An ambiguity may be patent or latent. *See Newsom v. United States*, 230 Ct.Cl. 301, 676 F.2d 647, 650 (1982). A patent ambiguity is one that is apparent from the face of the contract; a latent ambiguity becomes evident when, considered in light of the objective circumstances, two conflicting interpretations appear reasonable. *See ITT Arctic Servs., Inc. v. United States*, 207 Ct. Cl. 743, 524 F.2d 680, 692 (1975). A latent ambiguity, under the rule of *contra proferentem*, is construed against the drafter of the contract, provided that (1) the non-drafting party's interpretation is reasonable, *see Community Heating*, 987 F.2d at 1579, and (2) the non-drafting party has reasonably relied on its interpretation, *see Froeschle Sons, Inc. v. United States*, 891 F.2d 270, 272 (Fed.Cir. 1989).

### *Discussion*

Based on its previous conclusion that the contract is latently ambiguous, *see Cray Research*, 41 Fed.Cl. at 435, the court ordered a trial to consider extrinsic evidence of the contract's meaning. *See Sylvania Elec. Prods., Inc. v. United States*, 198 Ct.Cl. 106, 458 F.2d 994, 1005 (1972) (if a written contract is unclear, prior or contemporaneous extrinsic evidence that does not contradict the written language of the contract may be introduced to establish its meaning). At trial, the parties presented testimony addressing, *inter alia*, the following issues: (1) whether the terms of the contract were drafted by one party or negotiated; (2) the parties' reasonable intentions at the time Mod 9 was negotiated; (3) the reasonableness of the parties' respective interpretations of the contract; (4) the pre-dispute course of dealings between the parties; and (5) government and industry practice.

### 1. *Contra Proferentem*

▬ Under the rule of *contra proferentem*, a latently ambiguous contract is construed against its drafter if the interpretation advanced by the non-drafter is reasonable. *See Metric Constructors, Inc. v. NASA*, 169 F.3d 747, 751 (Fed.Cir.1999); *Community Heating*, 987 F.2d at 1579. However, when the contract terms are negotiated, *contra proferentem* is inapplicable. *See Consumers Ice Co. v. United States*, 201 Ct.Cl. 116, 475 F.2d 1161, 1165 (1973); *Kaiser Aluminum & Chem. Corp. v. United States*, 181 Ct.Cl. 902, 388 F.2d 317, 329 (1967).

The court finds as fact that the terms of Mod 9 were negotiated. Both Lee Weimer and Gemma Berdahl (respectively, plaintiff's and defendant's chief negotiators of Mod 9, T29, 193) testified that Mod 9 was the prod-

uct of negotiations. In response to the question, "[W]as there any negotiation at all between Cray and the CIA about the terms [in Mod 9]," Ms. Weimer answered, "Yes. A gentleman I met on at least one occasion face to face, and we had discussions on the phone about various terms." T57. Ms. Berdahl stated that, while she "put pen to paper," the terms of Mod 9 were negotiated. T222–24, 238. Thus, the undisputed evidence shows that Mod 9 was negotiated. Because the parties negotiated Mod 9, *contra proferentem* does not apply.[2]

Even if *contra proferentem* applied, the court finds that plaintiff did not reasonably rely on its contemporaneous interpretation of the contract because none of plaintiff's witnesses in fact read the base agreement. For example, Ms. Weimer testified that she thought the government's termination rights were limited to: (1) a termination for convenience, or (2) congressional non-appropriation of funds. T35. She also stated that she did not understand the CIA to have an annual option to renew the contract. T35–36. However, Ms. Weimer's trial testimony also indicated that she was unfamiliar with the terms of the base (X–MP) contract. Specifically, she stated, "I don't recall familiarity with the contract period arrangements prior to the Y–MP." T62. She could not recall reading section F–4.5 of the contract, which limits the term of the Y–MP contract "through September 30, 1988." T64. Nor was she familiar with section H–10, which delineates the government's renewal option. T68.

Steven Van Hee, Cray's Treasurer, worked with Anne Webber to establish financing for the Y–MP with Citicorp. T101. Referencing the Cray–Citicorp term sheet[3] for the Y–MP, as well as Cray accounting documents,

D67, Mr. Van Hee testified that he thought the government's termination rights were limited to congressional non-appropriation or termination for convenience. T104, 110. However, Mr. Van Hee too admitted that he had not reviewed the base contract or Mod 9. T127. He also testified that he was unsure whether anyone in Cray's treasury department reviewed the contract before providing the term sheet to Citicorp, stating that "[w]e would basically rely on our contracts group's interpretation." T133.

Marc Bastow, the Citicorp vice president responsible for the Y–MP financing, T149–50, testified that he understood that government payments for the Y–MP were limited only by congressional non-appropriation or termination for convenience. T153; D97.2. He stated that if he thought the contract were subject to the government's renewal option, he would have increased the financing rate, "probably by 200 to 300 basis points." T153–54. Yet Mr. Bastow too read neither the contract terms nor Mod 9 in preparing the Y–MP's financing quote. T167–68. In assessing Citicorp's risk, he relied entirely on Cray's term sheet. T171. Indeed, Mr. Bastow testified that, had he been aware of section H–10, he would have increased the risk premium. T153–54, 189.

Thus, none of plaintiff's witnesses who testified about their interpretation of the contract (Ms. Weimer, Mr. Van Hee, and Mr. Bastow) actually *read* the contract in forming their interpretation. Clearly, there can be no reasonable reliance upon an interpretation of a contract when no one has actually read the contract terms. *See Lear Siegler Mgmt. Servs. Corp. v. United States*, 867 F.2d 600, 603 (Fed.Cir.1989) ("It is well settled that where a contractor seeks recovery based on his interpretation of an ambiguous contract,

---

2. Plaintiff claims that defendant admitted during the summary judgment stage of this proceeding that Mod 9 was drafted by the government. Specifically, plaintiff's proposed finding of uncontroverted fact number 24 (PFF 24), stated: "The Government's negotiator for [Mod 9] ... drafted the text of [Mod 9]. Cray did not jointly prepare or write the text of [Mod 9]." Defendant's response to this proposed finding was, "No objection."

This "admission" is not inconsistent with the trial testimony establishing that Mod 9 was nego-

tiated. Ms. Berdahl admitted at trial that she alone "put pen to paper" in drafting Mod 9. T224. This concession, however, does not change the undisputed fact that the actual terms of Mod 9 were negotiated.

3. The term sheet, which was generated by Cray and signed by Anne Webber,.P22, "basically lays out the terms and conditions for the benefit of the finance source so they can evaluate the transaction and provide ... an interest rate." T102.

he must show that he relied on this interpretation in submitting his bid."); *Richardson Camera Co. v. United States,* 199 Ct.Cl. 657, 467 F.2d 491, 496 (1972) (failure to read a contract cannot be used as a defense to the consequences of such an omission). Thus, even if Mod 9 was drafted solely by the CIA, the court would not construe the contract against defendant because plaintiff could not reasonably rely on an interpretation it never made at the time of contracting.

### 2. *Antideficiency Act*

Because *contra proferentem* does not apply here, the court must undertake its own interpretation of the contract, in light of the testimony heard at trial. A useful starting point is the Antideficiency Act, which prohibits the obligation of funds in advance of appropriation. The Antideficiency Act provides, in pertinent part:

> An officer or employee of the United States Government ... may not—(A) make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation; or (B) involve [the] government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law.

31 U.S.C. § 1341(a)(1).

Unless an agency has specific, multi-year contracting authority, 62 Comp.Gen. 569 (1983), or operates under a no-year appropriation, 43 Comp.Gen. 657 (1964), the Antideficiency Act prohibits contracts purporting to bind the government beyond one year. *See* 67 Comp.Gen. 190 (1988); 66 Comp.Gen. 556 (1987); 60 Comp.Gen. 584 (1981); *see also* General Accounting Office, 2 *Principles of Federal Appropriations Law* 6–25 (2d ed.1991).[4]

The lead case in this area is *Leiter v. United States,* 271 U.S. 204, 46 S.Ct. 477, 70 L.Ed. 906 (1926). In *Leiter,* the agency entered into a long-term lease under a one-year appropriation. Although the contract specified that payments for periods after the first year were subject to the availability of con-

gressional appropriations, *see id.* at 205, 46 S.Ct. 477, the court held the lease to be binding for the first fiscal year only. The court reasoned that, because

> at the time the[ ] [leases] were made there was no appropriation available for the payment or rent after the first fiscal year, it is clear that in so far as their terms extended beyond that year they were in violation of the express provisions of the [Antideficiency Act]; and, ... *they created no binding obligation against the United States after the first year* .... And it is plain that to make it binding for any subsequent year, *it is necessary, not only that an appropriation be made available for the payment of the rent, but that the Government ... affirmatively continue the lease for such subsequent year;* thereby, in effect, by the adoption of the original lease, making a new lease under the authority of such appropriation for the subsequent year.

*Id.* at 206–07, 46 S.Ct. 477 (citations omitted) (emphasis added).

 Thus, under *Leiter,* if an agency does not have multi-year contracting authority, *see supra* note 4, the only authorized course of action (apart from separate fiscal year contracts) is a one-year contract followed by a series of government renewal options. Each renewal option must be (1) contingent on future congressional appropriations, and (2) exercised only by the government's affirmative action. *See also* General Accounting Office, 1 *Principles of Federal Appropriations Law* 5–37 (2d ed.1991). The mere inclusion of a contract provision conditioning the government's obligation on future appropriations is insufficient. *See Leiter,* 271 U.S. at 205, 46 S.Ct. 477. Unless a multi-year contract is subject to the government's renewal option each year, it violates the Antideficiency Act.

Trial testimony showed that both parties were familiar with the Antideficiency Act's requirements and structured the agreement to prevent a violation. Ms. Berdahl stated that she understood the contract's renewal

---

4. There are three types of appropriations: annual, multi-year, and no-year. *See* General Accounting Office, 1 *Principles of Federal Appropri-*

*ations Law* 5–3 (2d ed.1991). Appropriations are presumed to be annual unless expressly stated otherwise. *See* 31 U.S.C. § 1301(c).

option clause, section H–10, was required to comply with the Antideficiency Act. T250. In forming this opinion Ms. Berdahl relied on *Federal Data Corp.*, 60 Comp.Gen. 584 (1981), which holds that multi-year contracts "do not violate the Antideficiency Act as long as they provide that the Government's obligation terminates at the end of each fiscal year and is renewed by the exercise of the option by the Government." T243–44. Ms. Weimer, Cray's contract negotiator admitted that she understood that Ms. Berdahl was bound by the Antideficiency Act and could not contract in advance of appropriations. T60.

The CIA has no multi-year contracting authority; all CIA appropriations are for one year. T433, 506–07; *see, e.g.*, Intelligence Authorization Act for Fiscal Year 1997, Pub.L. No. 104–293, 110 Stat. 3461 (1996); Intelligence Authorization Act for Fiscal Year 1996, Pub.L. No. 104–93, 109 Stat. 961 (1996). Accordingly, under *Leiter* and its progeny, the CIA may contract for only one fiscal year, followed by a series of option years, exercised only by the government's affirmative action. Any other form of multi-year contract would violate the Antideficiency Act.

 "The parties are presumed to have entered into a valid and binding contract." *Alvin, Ltd. v. United States Postal Serv.*, 816 F.2d 1562, 1564 (Fed.Cir.1987); *see also CRF–a Joint Venture of Cemco, Inc. v. United States*, 224 Ct.Cl. 312, 624 F.2d 1054, 1061 (1980). "[W]here a contract is fairly open to two constructions, by one of which it would be lawful and the other unlawful, the former must be adopted." *Hobbs v. McLean*, 117 U.S. 567, 576, 6 S.Ct. 870, 29 L.Ed. 940 (1886).

 Plaintiff's interpretation of the contract is that it obligates the CIA to make payments for all five years of the contract, so long as Congress appropriates funds each year. As discussed *supra*, a multi-year contract violates the Antideficiency Act *unless* the government retains the option to renew the contract each year after the base year. Thus, plaintiff's interpretation renders the contract in violation of the Antideficiency Act. Defendant, on the other hand, interprets the contract to be consistent with the Antideficiency Act; that is, that the contract is subject to the government's renewal option each year. Because the court must construe the contract as a valid and binding document, it must read the contract as granting the government the unilateral right to renew. Because the contract is subject to annual renewal, the government did not breach it by failing to make the final FY95 payment.[5]

Thus, the contracting officer here lacked the authority to contract in advance of appropriations. Accordingly, the CIA would not be bound by any attempt to contract in advance of appropriations, because the government is not bound by the unauthorized acts of its agents. *See Office of Personnel Management v. Richmond*, 496 U.S. 414, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990); *Kania v. United States*, 227 Ct.Cl. 458, 650 F.2d 264, 268 (1981).

### 3. *Pre–Dispute Course of Dealings*

This conclusion is bolstered by the parties' pre-dispute course of dealings. "It is a familiar principle of contract law that the parties' contemporaneous construction of an agreement, before it has become the subject of a dispute, is entitled to great weight in its interpretation." *Blinderman Constr. Co. v. United States*, 695 F.2d 552, 558 (Fed.Cir. 1982). Indeed, "how the parties act under the arrangement, before the advent of controversy, is often more revealing than the dry language of the written agreement by itself." *Macke Co. v. United States*, 199 Ct.Cl. 552, 467 F.2d 1323, 1325 (1972).

---

5. In Count IV of its complaint, plaintiff asserts that it is entitled to recover in *quantum meruit* because Mod 9 incorporated a payment-in-arrears arrangement where the FY95 payment was associated with the government's use of the Y–MP during FY94. A claim for *quantum meruit* is a suit based upon a contract implied-in-law, over which this court lacks jurisdiction. *See United* States v. Mitchell, 463 U.S. 206, 218, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). Even if the court had jurisdiction over plaintiff's *quantum meruit* claim, this alleged payment-in-arrears arrangement also would have been unlawful as an unauthorized act and also violated the Antideficiency Act. T529, 535. Therefore, Count IV must be rejected.

The CIA's pre-dispute conduct is consistent with defendant's current position that the Y–MP contract is a lease, subject to annual renewals. In 1989, Leo Hazelwood, former Comptroller of the CIA, directed an evaluation of the Y–MP acquisition pursuant to OMB Circular A 104, *Evaluating Leases of Capital Assets.* D87.25, T507–08. Mr. Hazelwood testified that, had the Y–MP been a purchase, this analysis would have been unnecessary. T509. Thus, as early as 1989, the CIA acted consistent with its belief that the Y–MP contract was a lease.

In addition, during performance, the parties treated the Y–MP contract as a lease, subject to the government's renewal option. On June 14, 1990, the contracting officer's technical representative sent the contracting officer a Form 2420, requesting *renewal* of the Y–MP contract for FY91. D32.26. Consequently, on October 1, 1990, the parties executed contract modification 13, "in accordance with Clause H–10(b)," extending the period of performance through September 30, 1991. P14.2. Plaintiff did not object to this language. Thus, prior to this dispute, both parties recognized that the contract was subject to annual renewal and that section H–10 was the mechanism for renewing the contract.

The parties executed modifications pursuant to H–10 for the FY92, 93, and 94 renewals. Modification 15 states that the government is "exercising [its] option to renew th[e] contract for FY92." P16.2. Ms. Weimer did not object to this characterization of the action as a renewal, T75–77; in fact, Ms. Weimer's internal record of modification 15 also referred to it as an exercise of the Government's "option to renew the Contract." D130.1. The CIA also executed unilateral options for FYs 1993 and 1994. P18.2, 19.2.

The court finds that, prior to this dispute, the parties treated the Y–MP contract as being subject to the CIA's yearly, unilateral renewal right. Because the court must construe the contract consistent with this conduct, the court finds that the Y–MP contract was subject to annual renewal and that the CIA was therefore not obligated to make the FY95 payment.

4. *Expert Testimony*

Finally, expert testimony indicated that the contract was subject to the CIA's option to renew. David Borland, currently the Vice Director, Office Command, Control, Communications, and Computers, Department of Army, was the only expert to testify at trial. T340–43. Mr. Borland testified that the contract had to have an annual renewal option; otherwise, it would violate the Antideficiency Act. T353–54. He stated, "If the [contract] is longer than a year, there must be an option. . . . because . . . in order to incur the obligation at the outset of the contract to cross into another fiscal year . . . if you don't have the monies available, then you can't do that." T406. Thus, based on his government experience, Mr. Borland opined that the only permissible way to read the contract (whether it is characterized as an LTOP, APP, or IPP) is as an agreement for annual payments to be made only after the government executes its unilateral option to renew. D213.4.

### Conclusion

For the reasons stated above, the court finds that the Y–MP contract is subject to the government's unilateral option to renew. Therefore, the government was not obligated to pay the final FY95 payment. The Clerk shall enter judgment for defendant.